*470 O’Connor, C.J.
{¶ 1} In this appeal, we determine whether the evidence supports the stated reasons for terminating the employment of a public school teacher, appellant, John Freshwater, for introducing religion into his eighth-grade science classes and for insubordination. More specifically, we must address whether the evidence was sufficient to demonstrate that appellee, Mount Vernon City School District Board of Education (“the board” or “the district”), terminated Freshwater for insubordination in refusing to remove religious displays in his classroom after being told to do so, and for continuing to inject his personal religious beliefs into his plan and pattern of instruction, thereby exceeding the bounds of the school district’s bylaws and policies, even after being forbidden to do so.
{¶ 2} After detailed review of the voluminous record in this case, we hold that the court of appeals did not err in affirming the termination. The trial court properly found that the record supports, by clear and convincing evidence, Freshwater’s termination for insubordination in failing to comply with orders to remove religious materials from his classroom. Accordingly, based on our resolution of this threshold issue, we need not reach the constitutional issue of whether Freshwater impermissibly imposed his religious beliefs in his classroom. We affirm the judgment of the court of appeals because there was ample evidence of insubordination to justify the termination decision.
Relevant Background
{¶ 3} Mount Vernon School Board asserts that despite the district’s instructions to cease doing so, Freshwater unequivocally injected his own Christian faith into his classroom as early as 1994 and continued to do so right up until he was relieved of his teaching duties. The board also asserts that after it denied Freshwater’s 2003 teaching proposal to critically evaluate evolution, Freshwater surreptitiously supplemented his eighth-grade science curriculum with religious handouts, showed videos on creationism and intelligent design, displayed religious materials in his classroom, and made various statements in class referring to the Bible.
{¶ 4} Freshwater, on the other hand, argues that the board violated his right to academic freedom pursuant to the First Amendment to the United States Constitution when it terminated him based on the content or viewpoint of his curriculum-related academic discussions with students and his use of supplemental academic materials.
*471 {¶ 5} We agree with the board and find that there is ample support for Freshwater’s termination based upon insubordination. We resolve this case solely as a teacher-employment-termination case governed by R.C. 3319.16, which sets forth standards and procedures for termination of teaching contracts by boards of education. We need not address the various constitutional issues raised by Freshwater, because we resolve this appeal on an other-than-constitutional ground. See, e.g., State ex rel. Essig v. Blackwell, 103 Ohio St.3d 481, 2004-Ohio-5586, 817 N.E.2d 5, ¶ 34, citing State ex rel. DeBrosse v. Cool, 87 Ohio St.3d 1, 7, 716 N.E.2d 1114 (1999) (“Courts decide constitutional issues only when absolutely necessary”).

Early Conduct

{¶ 6} The legal battle in this case began largely in 2007, when a student and his parents alleged that Freshwater used a Tesla coil[1] in class to make a mark on the student’s arm. But the antecedents of this case go back to 1994, when district administrators first instructed Freshwater not to distribute materials informing his students about a religious seminar. And district officials advised and counseled Freshwater multiple times about similar behavior in the 15 years that followed, directing him not to incorporate religious documents based upon creationism or intelligent design into his classroom instruction and to remove displays of religious materials from the classroom.
{¶ 7} The voluminous record here establishes, by clear and convincing evidence, that Freshwater has been insubordinate in the course of his employment with the district. For purposes of this appeal, however, we are specifically concerned with the occurrences of 2007 forward.
{¶ 8} Thus, we find it necessary to review in detail the evidence presented in the hearing conducted by a referee considering whether termination was warranted and summarized in the referee’s report issued after the hearing.

Background to the Referee’s Report and the Evidence at the Hearing

{¶ 9} After the hearing, which involved 38 different days of witness testimony spread out over almost 21 months, included more than 80 witnesses and hundreds of exhibits, and ultimately resulted in over 6,000 pages of transcript, the referee issued a report on January 7, 2011. In his report, the referee set forth the facts, including an overview of Freshwater’s sometimes contentious teaching record.
*472 {¶ 10} The referee addressed the four grounds asserted by the board in considering Freshwater’s termination: (1) the Tesla-coil incident, (2) his failure to adhere to established curriculum, (3) his role as administration-appointed facilitator, monitor, and supervisor of the student group Fellowship of Christian Athletes (“FCA”), and (4) his disobedience of orders.
{¶ 11} The referee ultimately concluded in his report that grounds two and four were valid bases to support Freshwater’s termination.

Freshwater’s teaching record and evaluations contain references to his incorporation of creationism and intelligent design in his classroom instruction

{¶ 12} In 1987, the board hired Freshwater as an eighth-grade science teacher. In addition to his teaching duties, Freshwater served as the administration-appointed facilitator, monitor, and supervisor of the FCA for more than 15 years.
{¶ 13} Freshwater’s students at Mount Vernon Middle School often performed at or above the state’s standards and requirements in achievement testing. Dr. Lynda Weston, former director of teaching and learning for the district, testified that Freshwater’s students’ science scores on state standardized tests were “the highest of the three eighth grade science teachers.”
{¶ 14} William Oxenford, a seventh-grade science teacher at Mount Vernon Middle School, also served as an academic-achievement coach. In the latter capacity, Oxenford was responsible for coordinating the implementation of strategies that would assist students in passing the achievement test. He confirmed that Freshwater’s students had the highest performance level on achievements tests of the students taught by the three eighth-grade science teachers. Similarly, Kerri Mahan, a teacher at Mount Vernon Middle School who also served on the “data team”, for improving standardized-test performance, testified that Freshwater’s students “showed proficiency and achievement” on those tests.
{¶ 15} During his employment with the district, Freshwater received at least 20 performance evaluations. Almost all were positive. In fact, Freshwater had never been disciplined before the precipitating events. But Freshwater’s teaching career certainly was not without controversy.
{¶ 16} Freshwater’s evaluations and communications from his superiors repeatedly directed him to cease distributing documents that presented students with information about intelligent design and creationism. Freshwater was admonished a number of times to abide by the board’s policy forbidding the teaching of religious thought in the curriculum.
{¶ 17} The first of these incidents occurred on September 19, 1994, when Freshwater received a memorandum from Jeff Kuntz, then the principal at Mount Vernon Middle School, regarding Freshwater’s distribution to students of *473 a handout entitled “Answers In Genesis” giving information about an upcoming seminar. The handout discussed in the memorandum described a “free meeting * * * for students * * * [to] learn the evidence that supports creation — and denies evolution.” (Emphasis sic.) The handout also stated that the seminar would “reveal why it is vital to believe in Genesis as it is written * * * [and] declare that many of the important issues in our troubled society (the breakdown of the family, abortion, lawlessness, etc.) are related to evolution!”
{¶ 18} In the memorandum, Kuntz instructed Freshwater to “please refrain from distributing materials not supported by your adopted course of study to students. Your classroom is not an appropriate format for disseminating information on religious seminars to students. In addition, please withdraw any extra credit you awarded to students who attended the ‘Answers In Genesis’ seminar.”
{¶ 19} The record contains limited information of any occurrences for a number of years that followed, with no additional counseling or intervention regarding Freshwater documented until January 21, 2003. That day, Freshwater received a mostly positive evaluation from Kuntz, who noted specifically that “Mr. Freshwater utilizes a good variety of methods and materials in his classroom.” But Kuntz also noted, under the section of the evaluation marked “Growth/Improvement Areas,” that Freshwater should “[c]ontinue to adhere to board policy and guidelines 2270 with respect to Religion In The Curriculum (see attached).” Kuntz attached the board’s policy and guidelines to Freshwater’s evaluation and later testified that he did so because of “two different situations” that had occurred in the fall of 2002.
{¶ 20} The first situation Kuntz referred to evidently arose when some teachers from the high school, in particular one science teacher, spoke to Kuntz about her concern that she was having to “reteach” evolution to students in her high-school classes. That teacher believed that Freshwater was contributing to that problem.
{¶ 21} The second incident Kuntz referred to arose from a complaint from a parent concerning a handout that Freshwater had distributed. Notably, however, at the hearing, Kuntz could not “exactly” recall the handout or its content.
{¶ 22} Although the record does not reveal whether these complaints had merit, Kuntz decided to act because two complaints had been voiced within a reasonably short period of time and he felt that he could not ignore them. Therefore, Kuntz attached the board policy and guidelines on religion in the curriculum because he felt it was a “very appropriate” way to make a statement to Freshwater that was relevant to the concerns raised in the complaints.
{¶ 23} The record establishes two patterns in Freshwater’s teaching career from 1994 through 2002 — he repeatedly received positive evaluations of his *474 teaching, and he repeatedly was advised not to distribute materials about creationism and intelligent design to students.

Freshwater’s proposal to “critically examine” evolution

{¶ 24} Despite receiving prior instructions not to provide students with religious information, Freshwater submitted a proposal to the board in 2003 entitled “Objective Origins Science Policy.” In that proposal, Freshwater requested that the board “[a]dd a policy statement to the MVCS [Mount Vernon City Schools] science curricula that allows teachers/students to critically examine the evidence both for and against evolution.” More specifically, Freshwater asserted that one problem with teaching evolution was that “the Mount Vernon City Schools do not offer a place in the curricula to scientifically and critically examine this theory” and that “there is confusion among some MVCS science teachers over whether they are even allowed to encourage critical scientific thinking on evolution, even though it is considered excellent scientific reasoning to do so with any other controversial science theories (such as the particle versus wave theories on light).”
{¶ 25} The board rejected Freshwater’s proposal. Its rejection was consistent with the State Board of Education’s subsequent decision to strike language similar to Freshwater’s proposal from the state of Ohio’s Academic Content Standards for K-12 science. When first adopted, those standards required schools to teach students to critically evaluate evolution, which is primarily taught in the eighth and tenth grades in Ohio’s public schools. Specifically, part of the relevant benchmark for grades nine and ten then provided, “Describe how scientists continue to investigate and critically analyze aspects of evolutionary theory. (The intent of this benchmark does not mandate the teaching or testing of intelligent design.)” The accompanying achievement indicator for grade ten tracked this language. But on February 14, 2006, the State Board of Education modified the above-mentioned benchmark and indicator to remove the foregoing language from its standards. Thus, the state no longer required or encouraged schools to teach students to critically evaluate evolution.
{¶ 26} But neither the board’s denial of his proposal nor the State Board of Education’s decision dissuaded Freshwater from teaching as if his proposal had been adopted.
{¶ 27} On April 7, 2006, Paul Souhrada, a parent of one of Freshwater’s students, submitted a complaint form to the district. In it, Souhrada alleged that on April 4, 2006, Freshwater distributed a handout to his son’s class entitled “Darwin’s Theory of Evolution — The Premise and the Problem.” Although Freshwater apparently collected the handouts at the end of class, Souhrada’s son kept his and gave it to his father. Souhrada checked the source of the information contained in the handout. In his complaint, he wrote that the *475 handout came from “All About God Ministries” and stated, “I don’t believe that is a proper source for science material, especially in light of the state school board’s decision in February to strike language regarding the critical evaluation of evolution from the state guidelines.”
{¶ 28} Six weeks later, on May 26, 2006, Charles Adkins, a science teacher at Mount Vernon Middle School, and Richard Cunningham, the science-department chairperson at Mount Vernon High School, wrote an e-mail to Weston and the district’s superintendent at the time, R. Jeff Maley, in response to Maley’s request that the school district review the handout mentioned in Souhrada’s complaint. Adkins and Cunningham stated that they had investigated the possible sources of the handout and examined the associated media related to the topic and had determined that the handout, as well as the original source of the material, had not passed the test of scientific peer review and acceptance by the scientific establishment. Neither of them was able to attribute this handout to a particular author, but they opined that the handout appeared in part or in its entirety on several intelligent-design websites.
{¶ 29} After reviewing the complaint and researching the handout, Adkins and Cunningham met with Weston and Freshwater so that Freshwater could provide background information regarding the handout’s alignment with the Ohio content standards, benchmarks, and indicators. Adkins and Cunningham wrote in the email to Maley that Freshwater’s “explanation [did] not match the direction or the tone of the article.” They also concluded that the “handout is inappropriate as an instructional resource for the grade level content benchmarks and indicators.”
{¶ 30} On June 8, 2006, Maley directed Freshwater, in writing, to cease use of the handout and similar materials. Maley wrote,
After review, I have determined the material in question cannot be attributed to a particular author or source. The material has not passed the test of scientific review and acceptance of the established scientific community. I am directing you to delete the material from your supplemental resources. Also, in the future please refrain from using materials that the source or author cannot be readily identified.
Maley subsequently emphasized that his main concern with the material was that it did not have a source and that the failure to provide sources was “bad practice.”
{¶ 31} Despite this warning and the prior incidents in which Freshwater had been warned not to distribute religious materials, there is no indication in the record suggesting that the district took adverse action against Freshwater for his practice of failing to cite sources in supplemental materials or his prior transgres *476 sions. But the following school year, new allegations arose that raised serious questions about Freshwater’s compliance with the directives of Superintendent Maley and his continued status with the district.

The allegations

{¶ 32} On December 7, 2007, Stephen and Jenifer Dennis met with Stephen Short, then the interim superintendent for the district. Their son was one of Freshwater’s eighth-grade science students and a participant in the FCA. The Dennises complained that on the day before, December 6, 2007, Freshwater used a Tesla coil to make a mark on their son’s arm that appeared to be in the shape of a cross.
{¶ 33} On December 10, 2007, Short met with William White, Mount Vernon Middle School principal, to investigate and determine what had taken place in Freshwater’s classroom. Later that same day, White met with Freshwater to discuss the incident. Freshwater admitted to White that he had used the Tesla coil on students during class and that he had used it to put an “X” on the Dennises’ son’s arm. But he also testified that he did not see that he had made any significant lasting mark on the student, let alone a mark in the shape of a cross.
{¶ 34} On January 22, 2008, White wrote a letter to Freshwater as a follow-up to their conversation on December 10. White stated that “the electrostatic machine(s) should not be used for purposes of shocking students” and “the machine(s) should be removed from the classroom or locked up so that the students do not have access to” them. White testified that after sending the letter to Freshwater, he never heard a single word or further complaint from the Dennises about the mark on their son’s arm until the Dennises filed suit against the board in April 2008.
{¶ 35} But in the intervening period, White heard several other concerns about Freshwater from the Dennises. For example, the Dennises complained about the manner in which Freshwater advised the FCA. They alleged that Freshwater was operating in an improper leadership role by directly participating in the organization’s affairs rather than simply monitoring it. Direct faculty participation in the organization was a violation of the FCA’s rules, which require that FCA clubs must be voluntary, student-initiated, and student-led.
{¶ 36} The district was also aware that Freshwater allegedly was not enforcing the required permission-slip policy for FCA events, was contacting speakers himself rather than having the students do so, and allegedly had conducted a healing session for a speaker who appeared at an FCA event who had been ill.
{¶ 37} The Dennises also complained that Freshwater had religious materials in the classroom.
*477 {¶ 38} On April 7, 2008, White met with Freshwater about these issues. White then instructed Freshwater, in clear and unequivocal writing, that Freshwater could not display religious materials in his classroom:
With regard to religious materials in your classroom, it has been brought to my attention that you have a bible out on your desk and that the “collage” on your classroom window includes the 10 commandments. While you certainly may read your bible on your own, duty free time [i.e. during lunch], it- cannot be sitting out on your desk when students are in the classroom and when you are supposed to be engaged in your responsibilities as a teacher. As for the 10 commandments, that part of your collage must be taken down and replaced with something that is not religious in nature. As a public school teacher, you cannot engage in any activity that promotes or denigrates a particular religion or religious beliefs while on board property, during any school activity or while you are “on duty” as a teacher. Unless a particular discussion about religion or religious decorations or symbols is part of a Board approved curriculum, you may not engage in religious discussions with students while at school or keep religious materials displayed in the classroom.
{¶ 39} On April 11, 2008, White once again met with Freshwater regarding the need to remove overtly religious icons and materials from display in his classroom.
{¶ 40} And on April 14, 2008, White yet again gave written instructions “to follow up” on his prior meetings, conversations, and writings with Freshwater regarding religious items in Freshwater’s classroom. White’s letter directed that “all religious items need to be removed from your classroom by the end of the day on Wednesday, April 16, 2008. Bibles and other religious DVD’s, videos, etc. should also be placed out of sight and access of the students by this date.” Freshwater signed the letter as acknowledgment of his receipt.
{¶ 41} But evidently, Freshwater was far from compliant. Despite having been directed repeatedly to remove the Bible and other religious items from his classroom, Freshwater proceeded to the school’s library, where he checked out two books, Jesus of Nazareth and the Oxford Bible. He then displayed them on a lab table in his classroom rather than keeping them from his students’ sight.
{¶ 42} And on April 16, 2008, the date by which he had been ordered to remove religious material from his classroom, Freshwater submitted a written statement *478 refusing to remove the Bible from his classroom.[2]
{¶ 43} As these events were unfolding, the Dennises’ attorney was formulating a letter to Short regarding what the Dennises believed to be “several instances of violations of the Establishment Clause of the First Amendment.” The letter, dated April 14, 2008, set forth eight alleged violations in bulletpoint fashion, including the Tesla-coil incident and regarding Freshwater’s behavior during FCA activities. As to one violation, the Dennises alleged that the Ten Commandments were displayed in Freshwater’s classroom and several Bibles were also kept in the classroom as a display to his students, not for his personal use. The Dennises averred, “This display represents an ostensible and predominant purpose of advancing religion and violates that central Establishment Clause value of official religious neutrality.” This allegation was supported by citing McCreary Cty., Kentucky v. Am. Civ. Liberties Union of Kentucky, 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).
{¶ 44} The Dennises also claimed that Freshwater teaches his personal beliefs, from the Bible, in his eighth-grade science class. According to the Dennises, students were taught the meaning of Easter and Good Friday in their science class. The Dennises further asserted that whenever Freshwater disagrees, based upon his own religious beliefs, with teaching material, he advises the students that although he is forced to teach from the textbooks, the teachings are wrong or not proven according to the Bible.
{¶ 45} In their letter, the Dennises requested three remedies: (1) the immediate removal of the Bibles and the Ten Commandments display, (2) Freshwater’s removal from both the classroom and his leadership role in the FCA as well as the commencement of an investigation regarding his violation of the laws of this country and the policies of the district, and (3) an agreement by the district to correct the concerns they raised and to follow the law.
{¶ 46} Counsel for the Dennises sent a follow-up letter on April 21, 2008, alleging a ninth violation by Freshwater. That letter alleged that since the date of the April 14, 2008 letter, Freshwater had continued to teach religion in his classroom, including the assignment of extra-credit work regarding intelligent design. Counsel wrote that it was obvious that Freshwater had not ceased his religious teachings and that the district nevertheless continued to allow Freshwater to teach eighth-grade science.

*479
Investigation by H.R. On Call, Inc.

{¶ 47} In response to the Dennises’ claims, the district engaged an independent investigator, H.R. On Call, Inc. (“HROC”),[3] to investigate the allegations. Beginning on April 23, 2008, and continuing through the end of the school year, a monitor sat in Freshwater’s classroom and took notes of classroom observations and of statements made in class. HROC investigated the Dennises’ nine concerns, along with the complaint from April 2006 regarding the handout on Darwin that Freshwater had used in class, by interviewing the Dennises’ child, former and current students, and 18 teachers and administrators, including Weston.
{¶ 48} In its summary of findings, HROC found that Freshwater’s teaching of evolution was not consistent with the district’s curriculum and state standards. Specifically, HROC found that Freshwater taught creationism or intelligent design and the unreliability of carbon dating as reasons to support opposing evolution and that he discussed the meaning of Easter and Good Friday with his students. Moreover, HROC found that Freshwater distributed materials from religious sources challenging evolution and then collected the materials back from the students in spite of specific directives not to teach religion, creationism, or intelligent design. In addition, HROC recounted evidence that Freshwater had told students that “science is wrong because the Bible states that homosexuality is a sin.” HROC concluded that Freshwater taught his religious beliefs in his classes.
{¶ 49} HROC also found that Freshwater gave an extra-credit assignment for students to view the movie Expelled, which is about intelligent design.
{¶ 50} HROC’s report included a finding that Freshwater was insubordinate by failing to remove all religious materials from his classroom as ordered by his superior, Principal White.
{¶ 51} HROC issued its 15-page report on June 19, 2008.

Board resolutions

{¶ 52} On June 20, 2008, the board unanimously passed a resolution titled “Intent to Consider the Termination of the Teaching Contract of John Freshwater.”[4]
{¶ 53} The board resolution set forth four grounds for Freshwater’s termination: (1) the Tesla-coil incident, (2) his failure to adhere to established *480 curriculum, (3) his role as facilitator, monitor, and supervisor of the FCA, and (4) his disobedience of orders.

Referee’s Report

{¶ 54} On June 30, 2008, Freshwater requested a public hearing pursuant to R.C. 3319.16. That request was honored, and the protracted hearing ensued. In his subsequent report and findings, the referee addressed the four specified grounds for Freshwater’s termination as set forth above in the board’s resolution.

Ground One: Tesla-coil incident

{¶ 55} The referee found that the Tesla-coil incident “became the focus of the curious * * * and print media” due to the sensational and provocative nature of the allegation. He also found that once sworn testimony was presented regarding the incident, it became obvious that “speculation and imagination had pushed reality aside.” He found that the Tesla-coil issue was at an end as soon as White instructed Freshwater to stop using it. Freshwater did in fact stop using the Tesla coil for any purpose thereafter. Thus, the referee found that the Tesla-coil incident did not seem to be a proper subject for the amended resolution.

Ground Two: Freshwater’s failure to adhere to established curriculum

{¶ 56} The referee found that Freshwater injected his personal religious beliefs into his plan and pattern of instruction of his students. According to the referee, in so doing Freshwater exceeded the bounds of all pertinent board policies and bylaws, including “Religion in the Curriculum,” “Controversial Issues,” “Religious/Patriotic Ceremonies and Observances,” “Religious Expression in the District,” and “Academic Freedom of Teachers.” The referee found that Freshwater instructed his students to examine evidence both for and against evolution, as if his proposed policy for doing so had been adopted by the board, and that Freshwater presented evidence against evolution by passing out and collecting handouts and showing videos. The evidence against evolution was based upon the Christian religious principles of creationism and intelligent design, running afoul of the board’s policies entitled “Religion in the Curriculum” and “Religious/Patriotic Ceremonies and Observances.”
{¶ 57} The referee relied on testimony by Jim Stockdale, a retired teacher from the district. Stockdale testified that in the fall of 2006, he was a substitute special-education teacher and that he accompanied his students into Freshwater’s classroom and sat in one of the student desks in the back.[5]
*481 {¶ 58} Stockdale testified that Freshwater started the class on a new unit regarding the origin of the universe. According to Stockdale, Freshwater stated that “oftentimes scientists and information in textbooks are incorrect” and that as an example Freshwater stated that in an article in Time magazine, scientists had found a genetic link to homosexuality. But, Stockdale testified, Freshwater then told the students that the “scientists in the article were wrong because the Bible states that homosexuality is a sin, so anyone who chooses to be a homosexual is a sinner; and that, therefore, science can be wrong, scientists can be wrong.” Then, Freshwater concluded that the material in the textbook in that particular unit could be incorrect.
{¶ 59} The referee concluded:
[I]n one incident, witnessed by an experienced and seasoned educator, John Freshwater not only injected his subjective, biased, Christian religion based, non-scientific opinion into the instruction of eighth grade science students but also gave those students reason to doubt the accuracy and or veracity of scientists, science textbooks, and/or science in general.

Ground Three: Freshwater’s role as facilitator, monitor, and supervisor of FCA

{¶ 60} Regarding ground three, the referee stated that although “Freshwater was provided a copy of the guidelines for the conduct of [FCA] on more than one occasion * * *, Freshwater did not follow the guidelines implicitly.” The referee concluded that there were several acts — Freshwater instituting a prayer, admitting to putting his hands up during a prayer, and praying for a guest speaker— that constituted violations of the FCA Handbook for Public Schools. However, the referee did not discuss these violations in later setting forth his conclusions regarding Freshwater’s termination.

Ground Four: Freshwater’s disobedience of orders

{¶ 61} Regarding ground four, which is dispositive for purposes of our opinion, the referee stated that school administrators were concerned about materials displayed in Freshwater’s classroom, including the “handwritten Bible verses, videos, posters, and a Living Bible.” The referee also found that White was assigned the task of implementing a plan of corrective action. The referee further stated:
*482 Beginning on April 7, 2008 [White] had several contacts with John Freshwater both in person and in writing. Principal White testified that “there were several meetings and several conversations in April.” He further testified that multiple contacts with John Freshwater became necessary “because the things that I had asked to happen on April 7th were not attended to.” Granted, there may have been some confusion about the instructions, orders, and directives which Mr. White gave John Freshwater. However, it is abundantly clear that what may have begun as confusion soon transformed into defiance.
Between April 7th and April 16, 2008, Mr. White clarified and reiterated the directives. Finally, he was forced to set a deadline for compliance— April 16, 2008. Two days prior (April 14, 2008), Mr. White and John Freshwater had a discussion about whether his disobedience would constitute insubordination. He (Freshwater) was told that it would be. Nevertheless, John Freshwater decided to comply only in part. * * * [Freshwater] also decided to add another element to the controversy. He checked out [two] religious texts from the school library and [testified that he positioned them on his lab table in his classroom]. John Freshwater’s explanation for this act included the phrases “it was a curiosity” and “it’s my inspiration.” These explanations seem questionable. The act appears to have been one of defiance, disregard, and resistance.
When Mr. White returned to John Freshwater’s classroom on April 16, 2008 to see if his directives had been followed, he discovered that they had not been. His testimony recounts his observations}:] “Almost everything had been removed, but there was still the Colin Powell poster * * * out of the school library he had checked out the Bible and had a book called Jesus of Nazareth.” John Freshwater admitted that he had not removed the Colin Powell poster. He explained * * * “with that poster, that’s a patriotic poster of our Commander and Chief’ * * * “and I don’t recall being told to remove it.”
(Ellipses sic; citations to transcript omitted.)

Referee’s conclusions

{¶ 62} The referee concluded that pursuant to R.C. 3319.16, a teacher may be terminated for “good and just cause,” meaning that “the conduct of the teacher in question must constitute a ‘fairly serious matter,’ ” quoting Hale v. Lancaster Bd. of Edn., 13 Ohio St.2d 92, 99, 234 N.E.2d 583 (1968). The referee found that Freshwater’s conduct constituted a fairly serious matter and was therefore “a *483 valid basis for his termination in accordance with ORC 3319.16.” Specifically, the referee stated:
John Freshwater was given ample opportunity to alter or adjust his content and style of teaching so as to avoid running headlong into the Establishment Clause and the Policy/Bylaws of the Mount Vernon Board of Education. Instead, he persisted in his attempts to make eighth grade science what he thought it should be — an examination of accepted scientific curriculum with the discerning eye of Christian doctrine. John Freshwater ignored the concept of in loco parentis and, instead, used his classroom as a means of sowing the seeds of doubt and confusion in the minds of impressionable students as they searched for meaning in the subject of science.
John Freshwater purposely used his classroom to advance his Christian religious views knowing full well or ignoring the fact that those views might conflict with the private beliefs of his students. John Freshwater refused and/or failed to employ objectivity in his instruction of a variety of science subjects and, in so doing, endorsed a particular religious doctrine. By this course of conduct John Freshwater repeatedly violated the Establishment Clause. Without question, the repeated violation of the Constitution of The United States is a “fairly serious matter” and is, therefore, a valid basis for termination of John Freshwater’s contract(s). Further, he repeatedly acted in defiance of direct instructions and orders of the administrators — his superiors. These defiant acts are also a “fairly serious matter” and, therefore, a valid basis for termination of John Freshwater’s contract(s).
{¶ 63} The referee’s final recommendation was that the board terminate Freshwater’s contract for good and just cause.

Freshwater’s Termination

{¶ 64} On January 10, 2011, the board, relying on the referee’s report, adopted it by a four-to-one vote and found that two main grounds (ground two, his failure to adhere to established curriculum, and ground four, his disobedience of orders) constituted good and just cause for the termination of Freshwater’s teaching contract.
{¶ 65} As to ground two, the board found that Freshwater injected his personal religious beliefs into his plan and pattern of instructing his students. In doing so, the board found, “he exceeded the bounds of all the pertinent Bylaws/Policies of the Mount Vernon City School District.”
*484 {¶ 66} As to ground four, the board found that “Freshwater acted in defiance of direct instructions and orders of the administrators” by failing to comply with the directive to remove or discontinue the display of all religious articles in his classroom, including all posters of a religious nature and had “brought additional religious articles into his classroom, in a direct act of insubordination.”
{¶ 67} The board determined that “each individual action independently constitutes ‘good and just cause’ for the termination of Mr. Freshwater’s teaching contract(s), whether considered individually or jointly,” and it therefore terminated Freshwater’s employment contract with the school district.
{¶ 68} On January 11, 2011, Barbara Donohue, treasurer of the school district, sent Freshwater a letter informing him of the board’s vote to terminate his contract at the board meeting.

Procedural History

{¶ 69} After his termination, Freshwater brought suit in the Knox County Common Pleas Court to appeal the board’s resolution terminating his contract and to request that the trial court conduct additional hearings. The trial court reviewed the referee’s report and the evidence and found that there was clear and convincing evidence to support the board’s termination of Freshwater’s employment “for good and just cause.” Thus, the trial court affirmed the board’s resolution.
{¶ 70} Freshwater appealed to the Fifth District Court of Appeals. In his sole assignment of error, he argued that the trial court abused its discretion in finding that there was clear and convincing evidence to support the board’s termination of his employment contract for good and just cause, in affirming the board’s termination of his employment contract, and in ordering him to pay the costs of the appeal. 2012-Ohio-889, 2012 WL 714392, at ¶ 15.
{¶ 71} The court of appeals affirmed. In doing so, the appellate court held that pursuant to Graziano v. Amherst Exempted Village Bd. of Edn., 32 Ohio St.3d 289, 513 N.E.2d 282 (1987), it was compelled to affirm the trial court’s judgment unless it determined that the trial court abused its discretion. Id. at ¶ 21. In its analysis, the court of appeals held that it did not
perceive an “unreasonable, arbitrary or unconscionable attitude,” nor one that is “not merely error of judgment, but [one of] perversity of will, passion, prejudice, partiality, or moral delinquency.” To the contrary, the referee’s memorandum provides a well-reasoned and articulated basis for affirming the decision of the Board and for the trial court to accept the recommendation of the referee.
*485 Id. at ¶ 22.
{¶ 72} The appellate court held that pursuant to Graziano, the “ ‘report and recommendation undertaken by the referee pursuant to R.C. 3319.16 must be considered and weighed by the board of education,’ ” and that “ ‘due deference must be accorded to the findings and recommendations of the referee * * * who is best able to observe the demeanor of the witnesses and weigh their credibility.’ ” (Emphasis added by the appellate court.) Id. at ¶ 23, quoting Graziano at 293. The appellate court then rejected Freshwater’s contentions that there was not sufficient evidence to sustain the board’s termination decision and that additional hearings were necessary.
{¶ 73} The Fifth District next rejected Freshwater’s contention that “the conduct found did not rise to the level of good and just cause sufficient to terminate his contract.” Id. at ¶ 26. The appellate court stated that in Hale v. Lancaster Bd. of Edn., 13 Ohio St.2d at 99, 234 N.E.2d 583, “good and just cause” is defined as a “fairly serious matter,” and observed that the referee found that Freshwater’s “ ‘repeated violation of the Constitution of the United States’ ” and his repeated acts “ ‘in defiance of direct instructions and orders of the administrators — his superiors’ ” — both constituted a “fairly serious matter.” Id. at ¶ 27, quoting the referee’s report.
{¶ 74} The court of appeals noted that “a hearing spanning nearly two years was conducted, testimony from over 80 witnesses was received, a transcript of over 6,000 pages was produced, and approximately 350 exhibits were admitted into evidence.” Id. at ¶ 31. It further noted that Freshwater “was represented by a competent attorney, he was permitted to fully explain his actions, he presented witnesses on his behalf, and he had a full opportunity to challenge the Board’s key witnesses.” Id. at ¶ 32. The Fifth District concluded that the trial court did not abuse its discretion by rejecting Freshwater’s requests for additional hearings and that the common pleas court’s decision to affirm the termination was not an abuse of discretion. Id. at ¶ 33-34. Therefore, the appellate court overruled Freshwater’s sole assignment of error. Id. at ¶ 36.
{¶ 75} We accepted Freshwater’s discretionary appeal, 132 Ohio St.3d 1461, 2012-Ohio-3054, 969 N.E.2d 1230, and now affirm.
Analysis

Standards for Termination of a Teacher’s Contract

{¶ 76} Before a board of education can terminate a teacher’s contract, it must comply with R.C. 3319.16, which sets forth the procedures for terminating a contract:
*486 [T]he employing board shall furnish the teacher a written notice signed by its treasurer of its intention to consider the termination of the teacher’s contract with full specification of the grounds for such consideration. * * * [T]he teacher may file with the treasurer a written demand for a hearing before the board or before a referee * * *. The hearing shall be conducted by a referee appointed pursuant to section 3319.161 of the Revised Code * * * and shall be confined to the grounds given for the termination. * * *
* * * After a hearing by a referee, the referee shall file a report within ten days after the termination of the hearing. * * * After consideration of the referee’s report, the board, by a majority vote, may accept or reject the referee’s recommendation on the termination of the teacher’s contract. After a hearing by the board, the board, by majority vote, may enter its determination upon its minutes. Any order of termination of a contract shall state the grounds for termination. * * *
Any teacher affected by an order of termination of contract may appeal to the court of common pleas of the county in which the school is located within thirty days after receipt of notice of the entry of such order. * * * The court shall examine the transcript and record of the hearing and shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record.
{¶ 77} If a party to an R.C. 3319.16 proceeding, i.e., termination of a teacher’s contract, appeals to an appellate court, “[ajbsent an abuse of discretion on the part of the trial court, the court of appeals may not engage in what amounts to a substitution of judgment of the trial court.” Graziano, 32 Ohio St.3d at 294, 513 N.E.2d 282. “The term ‘abuse of discretion’ has been defined as implying ‘not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.’ ” Id. (Douglas, J., concurring), quoting State ex rel. Shafer v. Ohio Turnpike Comm., 159 Ohio St. 581, 590-591, 113 N.E.2d 14 (1953).
{¶ 78} Here, the board had good and just cause to terminate Freshwater’s contract. The court of appeals held: “There was sufficient evidence to support both the referee and [the board’s] findings, and we do not determine issues involving credibility.” 2012-Ohio-889, 2012 WL 714392, at ¶ 24. The appellate court held that it did “not perceive an ‘unreasonable, arbitrary or unconscionable attitude,’ nor one that is ‘not merely error of judgment, but [one of] perversity of will, passion, prejudice, partiality, or moral delinquency.’ ” Id. at ¶ 22.
{¶ 79} Upon careful review, we agree.

Display of Religious Materials

{¶ 80} White’s letter to Freshwater made clear that Freshwater, as a public school teacher, could not “engage in any activity that promotes or denigrates a *487 particular religion or religious beliefs while on board property, during any school activity,” or when he was teaching. The district simply stated what the law, and the First Amendment, commands.
{¶ 81} Freshwater not only ignored the school district’s directive, he defied it. After he was directed to remove the items, Freshwater deliberately added to them, incorporating the Oxford Bible and Jesus of Nazareth into the classroom. He then refused to remove his personal Bible from his desk, and refused to remove a depiction of former President George W. Bush and Colin Powell and others in prayer from his wall.
{¶ 82} Pursuant to R.C. 3319.16, a public school teacher’s contract may not be terminated except for good and just cause. When a teacher has been insubordinate, good and just cause exists for a board of education to terminate that teacher’s contract. In the context of teacher-contract-termination cases, the term “insubordination” has been defined to include a willful “disobedience of, or refusal to obey, a reasonable and valid rule, regulation, or order issued by the school board or by an administrative superior.” Annotation, What Constitutes “Insubordination” as Ground for Dismissal of Public School Teacher, 78 A.L.R.3d 83, 87 (1977).
{¶ 83} This is a succinct definition of the term “insubordination,” and we adopt it for our purposes here. We therefore hold that in a proceeding under R.C. 3319.16 for the termination of a public school teacher’s contract, “good and just cause” includes insubordination consisting of a willful disobedience of, or refusal to obey, a reasonable and valid rule, regulation, or order issued by a school board or by an administrative superior.
{¶ 84} It is undisputed that Freshwater willfully disobeyed orders when he failed to remove (1) his personal Bible, (2) Jesus of Nazareth and the Oxford Bible, and (3) the poster of government officials praying. But disobedience alone will not establish insubordination under the definition we adopt above. We must also find that the orders themselves were reasonable and valid. If any order was either unreasonable or invalid, Freshwater’s disobedience of it would not be insubordinate.

Freshwater’s personal Bible

{¶ 85} We begin by considering Principal White’s order for Freshwater to remove his personal Bible from his desk. We conclude that this order was neither reasonable nor valid. The order infringed without justification upon conduct protected by the Free Exercise Clause of the First Amendment to the United States Constitution. The district’s proffered rationale for the order — that Freshwater’s display of his Bible on his desk violated the Establishment Clause— was erroneous, because this Bible presented no such violation.
*488 {¶ 86} Teachers do not abandon their First Amendment rights when they enter their classrooms. Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (students and teachers do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate”). Included in those First Amendment rights is the ability to freely exercise one’s religion. The protections of the Free Exercise Clause apply whenever the government “regulates or prohibits conduct because it is undertaken for religious reasons.” Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
{¶ 87} Freshwater’s conduct in keeping his personal Bible at his desk was plainly undertaken for religious reasons. And the district sought to regulate that conduct solely because the conduct was religiously motivated. Thus, when the district ordered Freshwater to put away his personal Bible, it infringed upon religious conduct protected by the Free Exercise Clause, something Freshwater has asserted throughout this controversy. See Hudson v. Palmer, 468 U.S. 517, 547, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), fn. 13 (Stevens, J., concurring in part and dissenting in part) (“possession of * * * personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause”); Warnock v. Archer, 380 F.3d 1076, 1082 (8th Cir.2004) (personal religious effects in school superintendent’s office, including Bible, were protected by Free Exercise Clause).
{¶ 88} Because the First Amendment protected Freshwater’s conduct, we must determine whether the school had a legitimate justification for prohibiting that conduct.[6] The district provided only one reason for why it ordered Freshwater to remove his personal Bible: it wanted to avoid an Establishment Clause violation. The district undeniably has an interest in avoiding Establishment Clause violations, and this interest may even justify infringement on teachers’ First Amendment rights. Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Good News Club v. Milford Cent. School, 533 U.S. 98, 112-113, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). But the interest must be grounded in reality; the district’s mere fear of an Establishment Clause violation will not justify burdening First Amendment protections. See United States v. Natl. Treasury Emps. Union, 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), quoting Whitney v. California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) *489 (Brandéis, J., concurring) (First Amendment restrictions “requir[e] a justification far stronger than mere speculation about serious harms. * * * ‘Men feared witches and burnt women’ ”). If the district was acting to avoid an Establishment Clause violation, there actually needed to be an Establishment Clause violation to avoid. Lamb’s Chapel v. Ctr. Moriches Union Free School Dist., 508 U.S. 384, 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (rejecting school district’s Establishment Clause defense because its “posited fears of an Establishment Clause violation are unfounded”); Brown v. Polk Cty., Iowa, 61 F.3d 650, 659 (8th Cir.1995) (baseless fear of Establishment Clause violation could not justify county’s order for public employee to remove Bible from his desk).
{¶ 89} In this case, we must reject the district’s justification because the inconspicuous presence of Freshwater’s personal Bible posed no threat to the Establishment Clause and the record supports that he did not use the Bible while teaching. A public school violates the Establishment Clause if its actions could reasonably be perceived as an official endorsement of religion.[7] Cty. of Allegheny v. Am. Civ. Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 592-593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); Santa Fe Indep. School Dist. v. Doe, 530 U.S. 290, 305-308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 841-842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Endorsement occurs when the government “ ‘convey[s] or attempts] to convey a message that religion or a particular religious belief is favored or preferred.’ ” (Emphasis sic.) Cty. of Allegheny at 593, quoting Wallace v. Jaffree, 472 U.S. 38, 70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O’Connor, J., concurring in judgment). Endorsement connotes “ ‘promotion’ or *490 ‘favoritism.’ ” Capitol Square Rev. & Advisory Bd. v. Pinette, 515 U.S. 753, 764, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).
{¶ 90} The district does not convey a message that it endorses or promotes Christianity by simply allowing Freshwater to keep a personal Bible on his desk. Bd. of Edn. of Westside Community Schools v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (“schools do not endorse everything they fail to censor”); see also Helland v. S. Bend Community School Corp., 93 F.3d 327, 331 (7th Cir.1996) (in Establishment Clause challenge, school’s concern was with teacher reading Bible aloud to students, not with teacher merely carrying Bible with him). “Merely employing an individual * * * who unobtrusively displays [his] religious adherence is not tantamount to government endorsement of that religion * * *." Nichol v. ARIN Intermediate Unit 28, 268 F.Supp.2d 536, 554 (W.D.Pa.2003) (policy prohibiting elementary school teachers and employees from wearing religious jewelry deemed offensive to Free Exercise Clause); see also Draper v. Logan Cty. Pub. Library, 403 F.Supp.2d 608, 621 (W.D.Ky.2005) (permitting public library employee to have “unobtrusive displays of religious adherence * * * could not be interpreted by a reasonable observer as governmental endorsement of religion”). Allowing teachers to have personal religious items conveys a message of accommodation, not endorsement. See Nichols v. Caroline Cty. Bd. of Edn., D.Md. No. JFM-02-3523, 2004 WL 350337, at *12 (Feb. 23, 2004), fn. 15 (allowing teacher to keep personal Bible by his desk was an accommodation of teacher’s religious expression).
{¶ 91} The scene of Freshwater’s classroom and the particular physical setting of his Bible — key factors to. our endorsement inquiry — further demonstrate the impossibility of any perceived state endorsement of religion. See Cty. of Allegheny, 492 U.S. at 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (highlighting importance of context and physical setting in endorsement test). Freshwater kept his Bible at his desk. Teachers at Mount Vernon considered their desks to be personal space. The desk area was off-limits to students, and teachers often kept private items there. Freshwater had even posted a large “KEEP OUT” sign on the side of his desk. The personal nature of the space makes it unlikely that a reasonable observer would perceive official state endorsement of private items placed there.
{¶ 92} In addition to being on a personal workspace, rather than in a public, student-accessible area, Freshwater’s Bible was inconspicuous. It lay flat on his desk, amongst electronics, texts, office supplies, and other papers. Oftentimes, the Bible was buried under other materials. Teachers testified that there was “stuff all over his desk, so you couldn’t hardly see [the Bible]” and that it was “hard to find on his messy desk.” Many students never even noticed the Bible or only realized it was in the classroom after it became a highlight of this controversy. HROC concluded that the Bible was not on display; it was neither *491 prominently staged nor placed in a way that would draw any particular attention to it. Other witnesses testified that Freshwater himself never drew any attention to the Bible. Given this unobtrusive, obscured, personal setting, no reasonable observer would assume that the state intended to promote or endorse Freshwater’s Bible. See, e.g., ARIN Intermediate, 268 F.Supp.2d at 554 (“unobtrusiv[e] displays [of] religious adherence” by school employees do not imply government endorsement of religion and do not violate Establishment Clause).
{¶ 93} Finally, we consider that the district has the power to correct any misperceptions it anticipates. As the Supreme Court has stated, a school district’s “fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students.” Westside Community Schools, 496 U.S. at 251, 110 S.Ct. 2356, 110 L.Ed.2d 191. If the school does not want people to think that it promotes Freshwater’s beliefs, it can tell them so. Id.; see also Capitol Square, 515 U.S. at 769, 115 S.Ct. 2440, 132 L.Ed.2d 650 (“If Ohio is concerned about misperceptions, nothing prevents it from requiring all private displays * * * to be identified as such”).
{¶ 94} The Free Exercise Clause protected Freshwater’s conduct as to his personal Bible. When the district asked Freshwater to remove his Bible from his desk, it was not asking him to cease a meaningless activity. It was demanding that he give up his constitutionally guaranteed rights. The government can encroach upon constitutional rights, but it must have a legitimate reason for doing so. Here, the district’s reason was not legitimate. The district feared an Establishment Clause violation where none existed. Unsubstantiated fear alone cannot justify flouting the First Amendment.
{¶ 95} We therefore conclude that the district’s order for Freshwater to remove his personal Bible from his desk was neither reasonable nor valid; the order infringed on Freshwater’s free-exercise rights without justification. Because this particular order was invalid, Freshwater’s disobedience of the order cannot be considered insubordination or grounds for his termination.

The remaining orders

{¶ 96} Freshwater’s refusal to remove the other items from his classroom — the Oxford Bible, Jesus of Nazareth, and the George W. Bush/Colin Powell poster— presents a much simpler issue. Freshwater’s First Amendment rights did not protect the display of these items, because they were not a part of his exercise of his religion. Freshwater admitted that he checked out the additional books only in order to make a point once this controversy began. Thus, the district would not run afoul of the Free Exercise Clause by ordering Freshwater to remove these materials; the orders were both reasonable and valid. Freshwater’s willful disobedience of these direct orders demonstrates blatant insubordination. That *492 insubordination is established by clear and convincing evidence, and the record fully supports the board’s decision to terminate him on these grounds.

Teaching of Creationism and Intelligent Design Alongside Evolution Generally Disfavored

{¶ 97} We recognize that this case is driven by a far more powerful debate over the teaching of creationism and intelligent design alongside evolution. See, e.g., McLean v. Arkansas Bd. of Edn., 529 F.Supp. 1255 (E.D.Ark.1982). Federal courts consistently hold that the teaching of evolution in public schools should not be prohibited, Epperson v. Arkansas, 393 U.S. 97, 106-107, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), and have struck as unconstitutional policies and statutes that require public school teachers to devote equal time to teaching both evolution and the Biblical view of creation. See, e.g., Daniel v. Waters, 515 F.2d 485 (6th Cir.1975). The United States Supreme Court and at least one other federal court have held that teaching theories of creationism and intelligent design in public schools violates the Establishment Clause because they convey “supernatural causation of the natural world” and therefore are inherently religious concepts. Kitzmiller v. Dover Area School Dist., 400 F.Supp.2d 707, 736 (M.D.Pa.2005); Edwards v. Aguillard, 482 U.S. 578, 591-592, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). However, the Supreme Court holds that teaching creationism is not prohibited in public schools as long as it is done “with the clear secular intent of enhancing the effectiveness of science instruction.” Edwards at 594.
{¶ 98} The Supreme Court also cautions that the courts must be “vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools” because
[f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.
Id. at 583-584, citing Grand Rapids School Dist. v. Ball, 473 U.S. 373, 383, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).
{¶ 99} Here, we need not decide whether Freshwater acted with a permissible or impermissible intent because we hold that he was insubordinate, and his termination can be justified on that basis alone. Freshwater is fully entitled to an ardent faith in Jesus Christ and to interpret Biblical passages according to his *493 faith. But he was not entitled to ignore direct, lawful edicts of his superiors while in the workplace.
Conclusion
{¶ 100} For the reasons set forth in this opinion, we affirm the judgment of the court of appeals that upheld Freshwater’s termination.
Judgment affirmed.
French and O’Neill, JJ., concur.
Lanzinger, J., concurs in syllabus and judgment.
Pfeifer, O’Donnell, and Kennedy, JJ., dissent.

. A Tesla coil, named after inventor Nikola Tesla, is “an air-core transformer for high-frequency alternating or oscillating electrical currents.” Webster’s Third New International Dictionary 2361 (1986). When the hand-held Tesla coil (also called a high-frequency generator) used for classroom demonstrations involved in this ease is properly adjusted and its electrode is held near a metal object, a spark jumps from the coil to the metal.

. By that date, Freshwater had removed the Ten Commandments from the collage in his classroom, but he refused to remove a poster depicting a Biblical verse above a photograph of former President George W. Bush and former Secretary of State Colin Powell in prayer with other government officials.

. According to the testimony of HROC’s owner at the hearing, HROC is “a human resources consulting firm that provides a full range of human resource services to clients.”

. On July 7, 2008, the board unanimously passed an amendment to the June 20, 2008 resolution, to change erroneous mentions of “American Content Standards” in the initial resolution to “Academic Content Standards” wherever that term appeared.

. Freshwater disputes Stockdale’s testimony and argues that Stockdale was not present in his classroom in the fall of 2006 and therefore could not have witnessed the alleged statement. The referee, however, found Stockdale’s testimony credible and, in fact, called it “[p]erhaps the most *481 egregious example” of Freshwater’s failure to adhere to established curriculum. Although Freshwater contests Stockdale’s testimony, we defer to the referee’s findings of fact.

. The relevant “conduct” here consists solely of Freshwater keeping his personal Bible on his desk. Numerous students testified that Freshwater never held up, read from, or opened his Bible during class. One student alleged that Freshwater once referred to his Bible during class, but HROC investigated this allegation and found no evidence to substantiate it. Many teachers, including Deborah Strouse, who monitored Freshwater’s classroom in 2008 when this controversy developed, similarly confirmed that Freshwater never used his personal Bible in class.

. Traditionally, courts have tested for Establishment Clause violations using the test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (government action violates the Establishment Clause if (1) it does not have a secular purpose, (2) its primary effect is to advance or inhibit religion, or (3) it creates an excessive entanglement between government and religion). In recent years, however, the Supreme Court has only intermittently used the Lemon test, and whether the test actually applies in any given scenario is difficult to discern. See, e.g., Utah Hwy. Patrol Assn. v. Am. Atheists, Inc., - U.S. -, 132 S.Ct. 12, 14, 181 L.Ed.2d 379 (2011) (Thomas, J., dissenting from the denial of certiorari) (“Our jurisprudence provides no principled basis by which a lower court could discern whether Lemon /endorsement, or some other test, should apply in Establishment Clause cases”). In its most recent cases dealing with the Establishment Clause in public schools, the Supreme Court has declined to apply Lemon, instead opting for the endorsement test. See Good News Club, 533 U.S. at 113, 115, 121 S.Ct. 2093, 150 L.Ed.2d 151; Santa Fe Indep. School Dist. v. Doe, 530 U.S. 290, 308-309, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000); Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 841-842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Even if we were to apply Lemon in this case, we would find no Establishment Clause violation. Simply allowing a teacher to keep his personal Bible on his desk would not have a religious purpose, would not advance religion, and would not excessively entangle government with religion.