[Cite as *Routson-Gim-Belluardo v. Jefferson Twp. Local School Dist. Bd. of Edn.*, 2016-Ohio-1265.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

GLORIA ROUTSON-GIM-
BELLUARDO

      Plaintiff-Appellant

v.

JEFFERSON TOWNSHIP LOCAL
SCHOOL DISTRICT BOARD OF
EDUCATION

      Defendant-Appellee

          :
          :
          :   C.A. CASE NO. 26789
          :
          :   T.C. NO. 15CV37
          :
          :   (Civil appeal from
          :    Common Pleas Court)
          :
          :
          :
          :

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___25th___ day of _____March_____, 2016.

. . . . . . . . . .

SUSAN D. JANSEN, Atty, Reg. No. 0039995, 111 West First Street, Suite 1100, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellant

NICHOLAS E. SUBASHI, Atty. Reg. No. 0033953 and TABITHA JUSTICE, Atty. Reg. No. 0075440, The Greene Town Center, 50 Chestnut Street, Suite 230, Dayton, Ohio 45440
      Attorneys for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Plaintiff-appellant Gloria Routson-Gim-Belluardo (hereinafter "Belluardo") appeals a decision of the Montgomery County Court of Common Pleas affirming defendant-appellee Jefferson Township Local School District Board of Education's

(hereinafter "the Board") Resolution and Order of Termination (hereinafter "the Order"). The Board's Order resulted in the termination of Belluardo's position as an intervention specialist for Jefferson Township elementary students with special needs. Belluardo filed a timely notice of appeal with this Court on August 5, 2015.

{¶ 2} In 1999, Belluardo was hired as intervention specialist by Jefferson Township at Blairwood Elementary School for students in kindergarten through third grade. Belluardo's duties included creating individualized education plans (IEPs) for the special needs students assigned to her. An IEP is a document which lays out an intervention specialist's plan for achieving one year of academic growth for each special needs student assigned to his or her caseload. In addition to preparing annual IEPs, Belluardo was tasked with preparing quarterly progress reports for her special needs students in order to chart their progress in relation to the goals in their IEPs. The reports were sent home to the student's parents or guardians in order to inform them of the student's progress.

{¶ 3} In order to create an IEP for a particular group of students, Belluardo utilized various diagnostic tools to assess their reading level and general comprehension. Since approximately 2012, Belluardo utilized a test called the San Diego Quick Assessment (SDQA) to determine the reading and comprehension level of her students.

{¶ 4} In the 2013/2014 school year, the Board, in conjunction with the teacher's union (JTEA), adopted Ohio Teacher Evaluation System (OTES), a teacher assessment model created by the Ohio Department of Education. Under the OTES model, 50% of a teacher's annual evaluation score would be comprised of evidence of student academic growth. In order to satisfy the evaluation component for each teacher, the Ohio

Department of Education created Student Learning Objectives (SLOs). SLOs allow each teacher to develop and administer assessments in order to establish an academic growth target for their students and then determine their progress toward that target over the course of a school year. SLOs are used to calculate student growth for purposes of scoring teacher evaluations.

{¶ 5} The teacher was required to utilize the assessment (test) indicated in his or her SLO as a pre-test in order to determine the student's knowledge at the beginning of the school year before the subject matter was taught. Then, in April, the teacher was required to administer the assessment again in order to determine the student's progress in the subject matter over the course of the school year. The Ohio Department of Education established a template for teachers to use when creating their SLOs. The 2013-2014 school year was the first year that teachers in Jefferson Township were to be evaluated under the OTES model, and the first year that the teachers would be required to create SLOs. In order to insure compliance with the Ohio Department of Education's mandates, the Board created the Jefferson Township Local School District SLO Committee.

{¶ 6} On September 30, 2013, Belluardo attended a six-hour training session regarding the OTES model and the creation of SLOs. Thereafter, Belluardo decided to utilize the SDQA in her SLO in order to determine the extent of her students' vocabulary and reading level at the beginning of the school year and at the end of the school year. Specifically, Belluardo's approved SLO provided that she would administer the SDQA at the beginning of the year in order to document each student's baseline reading level. The SLO also provided that Belluardo would administer the SDQA once more at the end

of the year in order to determine how far each of her students' reading levels had progressed.

{¶ 7} The record establishes that Belluardo created two SLOs, one for her seventh grade language arts class and one for her special needs students in the English resource room. Belluardo had approximately five special needs students in her seventh grade language arts class, and all of the students in the English resource room were classified as special needs. Belluardo's SLOs were approved by the SLO Committee on November 21, 2013. Both of Belluardo's SLOs used the SDQA as the pre- and post-assessment. The approved SLOs for Belluardo included the pre-test SDQA reading scores for her students in her language arts class and those students in her English resource room.

{¶ 8} The SDQA is a nationally recognized test that is used to assess a student's reading level at a specific point in time. The actual test provides the teacher with brief instructions on how to implement it. Significantly, the words on the test are standardized and do not change. Simply put, the words on the pre-test are the exact same words that are on the student's post-test at the end of the year. It is undisputed that Belluardo had a great deal of experience regarding how to administer the SDQA. Belluardo acknowledged that she was aware that she could not provide her students with the words prior to administering the test.

{¶ 9} On April 11, 2014, Belluardo submitted her post-test results to the SLO Committee. Upon reviewing her final submission, the SLO committee immediately became concerned regarding the significant advancement in the reading levels of several of her students. Specifically, several special needs students in Belluardo's resource

room were reported as exhibiting four to five school years of growth in their reading ability in only six months. One of the volunteer teachers on the SLO Committee, Sandra Santos, testified that she taught some of Belluardo's students in her own classes and was confident that they could not have advanced so significantly in such a short period of time. The teacher's union president, Laurie Ann Crawford, also expressed her disbelief that those students, some of whom she also taught, could have advanced five grade levels of reading in only six months. Shortly thereafter, the SLO Committee convened a meeting in order to discuss their concerns over the final test results of Belluardo's students. The SLO Committee concluded that the results were invalid and contacted the state SLO support team for advice on how to handle the situation.

{¶ 10} On the morning of May 9, 2014, Belluardo met with Kimberly Heiligenberg, another volunteer teacher on the SLO Committee, and reported that she had turned over her student assessments to Blairwood Principal Walter Sledge. Belluardo further stated that she could not locate the assessment of one of the students. Heiligenberg testified that during the meeting, Belluardo admitted that she had given her students word lists directly from the SDQA to study over winter and spring breaks. Later that same day, Belluardo met with the SLO Committee including Principal Sledge. The committee informed Belluardo that it was very skeptical regarding her students' significant reading level advancement. Belluardo again acknowledged that she had provided her students with a list of words from the SDQA to study over winter and spring breaks. When asked why she gave the students the list of words, Belluardo stated that she did not think it was prohibited.

{¶ 11} During the May 9, 2014, meeting, the SLO Committee provided Belluardo

with an agreement which states as follows:

> Per our conversation regarding the invalid data on the finalized copy of the SLO for Mrs. Belluardo, as a committee we decided that the rating for Mrs. Belluardo will consist of Shared Attribution.   This was after several phone calls to the SLO representative for our region.   As a committee we met with Mrs. Belluardo and explained the situation after comparing her results to practice OAA[1] scores.   Upon discussion we learned that Mrs. Belluardo practiced the results of the standardized test (San Diego quick reading assessment) specifically by providing a list of tested words to the students, which provided an advantage to the test results.

Hearing Exhibit 18.   Although she would later claim that she did so under duress, Belluardo signed the agreement.   Principal Sledge forwarded the signed agreement to School Superintendent Robert Gates.   Dr. Gates directed Principal Sledge to conduct an investigation into whether Belluardo had committed academic fraud by providing the list of words to her students, thereby artificially inflating their scores on the SDQA.   Belluardo went on sick leave beginning the following Monday of school.

{¶ 12} While she was on sick leave, Belluardo submitted a partial retraction of her signature on the May 9, 2014, agreement.   In her submission, Belluardo stated that she wanted to retract the words "invalid data" and "standardized test" from the agreement. Significantly, Belluardo did not retract the statement that she had practiced the results of the SDQA with her students by providing them a list of the tested words to study.

---

[1] Ohio Achievement Assessment.

{¶ 13} On May 19, 2014, Dr. Gates suspended Belluardo's teaching contract due to the allegations and evidence of academic fraud. On May 19, 2014, Belluardo was provided the opportunity to challenge her suspension in a meeting with Dr. Gates and her union representative. Dr. Gates testified that during the meeting, Belluardo acknowledged that she had provided her list of the words used in the SDQA to her students for them to study. Dr. Gates, therefore, recommended to the Board that Belluardo's teaching contract be terminated.

{¶ 14} After learning of Dr. Gates recommendation, Belluardo requested a hearing before an impartial referee pursuant to R.C. 3319.16. The hearing was subsequently held on September 22, 23, and 25, 2014. During the hearing, Belluardo testified that she never provided her students with a list of words from the SDQA. Rather, Belluardo testified that she typed all of the words from the SDQA list onto a large "Word" document, printed the finished document, and cut out only the word(s) that a student missed during the test. Belluardo testified that she would then place the strips of paper with the missed words into a plastic baggie with some candy and give the baggies to her students for them to take home and study. Belluardo acknowledged that she had never told the SLO Committee about the plastic baggies prior to the hearing.

{¶ 15} During the hearing, Belluardo testified that she practiced the SDQA with her students on two additional occasions between the pre-test and the post-test. In fact, Belluardo testified that she administered the SDQA a total of four times to all of her students. Belluardo testified that she was unaware the she could not administer the test an additional two times. Belluardo, however, testified that she *was* aware that the more times she showed her students the SDQA, the more likely it would be that they would

memorize the words and do better on the test.

{¶ 16} Evidence was also adduced at the hearing that Belluardo made several mistakes when scoring and recording the students' results on the SDQA. Belluardo testified that she recorded some students as having higher scores than those which they should have received. Belluardo recorded some students as having lower scores than they actually should have received. The evidence established that one student who she admitted "could barely read at all" was incorrectly recorded by her as reading at a second grade level at the beginning of the year. Six months later, Belluardo recorded the same student as being able to read at a third grade level. Belluardo further testified that she raised one student's score on the SDQA because that student "had self-esteem issues."

{¶ 17} In her English resource room class, every student was on an IEP due to some type of learning disability. Nevertheless, the evidence established that by virtue of their score on the post-test SDQA administered by Belluardo, every student in that class met his or her growth target regarding their reading level. Notably, with the exception of three students in the resource room class, the students exceeded their reading level growth target for a full academic year. Two students advanced five grade levels in reading in only six months. The evidence established that another student in the resource room who required a great deal of accommodation for his learning disabilities, advanced from the first grade to a fifth grade reading level in only six months.

{¶ 18} In a decision issued on December 3, 2014, the impartial referee found that the Board had failed to establish that Belluardo committed academic fraud regarding her implementation and scoring of the SDQA portion of her SLO. Accordingly, the referee recommended against terminating Belluardo's teaching contract. The Board convened

on December 8, 2014, and rejected the referee's recommendation, concluding that his findings were manifestly against the greater weight of the evidence. Finding that there was "good and just cause" to terminate Belluardo's teaching contract, the Board specifically noted evidence adduced at the hearing which the referee failed to address and/or consider.

**{¶ 19}** On January 5, 2015, Belluardo appealed the Board's decision to the Montgomery County Court of Common Pleas pursuant to R.C. 3319.16. In a decision issued on July 10, 2015, the trial court denied Belluardo's administrative appeal and affirmed the Board's decision terminating her teaching contract. The trial court essentially concluded that Belluardo's manner of administration of the SDQA to measure her students' growth in word comprehension and reading ability constituted good and just cause for Belluardo's termination as her conduct led to the students not being properly assessed and taught. This conduct also influenced her evaluation as a teacher.

**{¶ 20}** It is from this judgment that Belluardo now appeals.

**{¶ 21}** Belluardo's sole assignment of error is as follows:

**{¶ 22}** "THE TRIAL COURT ERRED IN DENYING GLORIA ROUTSON-GIM-BELLUARDO'S ADMINISTRATIVE APPEAL AND GRANTING JUDGMENT IN FAVOR OF JEFFERSON TOWNSHIP LOCAL SCHOOL DISTRICT BOARD OF EDUCATION."

**{¶ 23}** In her sole assignment, Belluardo contends that the trial court erred when it affirmed the decision of Board which found that she committed academic fraud and terminated her teaching contract. Specifically, Belluardo argues that the trial court failed to give due deference to the referee's findings of fact and recommendation that she retain her teaching position in Jefferson Township. Belluardo also asserts that the record is

devoid of evidence that she acknowledged improper conduct by providing her students with the word lists in the SDQA.

{¶ 24} Before a board of education can terminate a teacher's contract, it must comply with R.C. 3319.16, which sets forth the procedures for terminating a contract:

[T]he employing board shall furnish the teacher a written notice signed by its treasurer of its intention to consider the termination of the teacher's contract with full specification of the grounds for such consideration. * * * [T]he teacher may file with the treasurer a written demand for a hearing before the board or before a referee * * *. The hearing shall be conducted by a referee appointed pursuant to section 3319.161 of the Revised Code * * * and shall be confined to the grounds given for the termination. * * *

* * * After a hearing by a referee, the referee shall file a report within ten days after the termination of the hearing. * * * After consideration of the referee's report, the board, by a majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract. After a hearing by the board, the board, by majority vote, may enter its determination upon its minutes. Any order of termination of a contract shall state the grounds for termination. * * *

Any teacher affected by an order of termination of contract may appeal to the court of common pleas of the county in which the school is located within thirty days after receipt of notice of the entry of such order. * * * The court shall examine the transcript and record of the

hearing and shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record.

**{¶ 25}** In an R.C. 3319.16 proceeding, both the Board and the trial court must give due deference to the findings of the referee "because it is the referee who is best able to observe the demeanor of the witnesses and weigh their credibility." *Cephus v. Dayton Bd. Of Ed.*, 2d Dist. Montgomery No. 13884, 1993 WL 435583, *7 (Oct. 27, 1993); citing *Graziano v. Amherst Village Bd. Of Edn.*, 32 Ohio St.3d 289, 293, 513 N.E.2d, 282 (1987). The court of common pleas, however, "may reverse an order of termination of a teacher's contract, made by a Board of Education, where it finds that such order is not supported by or is against the weight of the evidence." *Id.*

**{¶ 26}** "While a court of common pleas possesses the power to weigh the evidence and determine credibility of witnesses in an R.C. 3319.16 proceeding, an appellate court reviewing that determination is under a limited scope of review. Absent an abuse of discretion on the part of the trial court, the court of appeals may not engage in what amounts to a substitution of judgment of the trial court in an R.C. 3319.16 proceeding." *Graziano* at 294. Therefore, the common pleas court's judgment cannot be reversed absent a finding of abuse of discretion. *Id*.

**{¶ 27}** "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 553 N.E.2d 597 (1990); *Feldmiller v.*

*Feldmiller,* 2d Dist. Montgomery No. 24989, 2012–Ohio–4621, ¶ 7. Judgments supported by "some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

{¶ 28} Belluardo initially argues that the trial court failed to give due deference to the findings of fact made by the referee. Based upon the evidence adduced at the hearing, the referee found there was a failure of proof that Belluardo provided word lists directly from the SDQA to her students and that she falsified the test results in order to artificially raise her teacher evaluation at the end of the school year. In reaching its conclusion, however, the Board concluded that the referee failed to consider the testimony of several witnesses who stated that Belluardo specifically admitted to giving her students the words from the SDQA to study in advance of the test. The referee's report, according to the Board, completely ignores Belluardo's signed statement in which she admitted to providing her students the word list in advance. The Board further concluded that the referee failed to address Belluardo's own handwritten statements printed on the word lists given to the students which stated "over Spring Break he studied list." The Board noted that the referee's report ignored the evidence presented regarding the numerous errors Belluardo made when scoring her students' tests, all of which coincidentally benefitted her when she was evaluated based on the students' increase in performance. Significantly, the Board explained that the referee failed to make any findings with respect to the admittedly high scores that the students received on the SDQA, specifically those students who improved four to five full grades in their reading

level in just six months.   Finally, as noted by the Board, the referee did not address the fact that Belluardo improperly administered the SDQA four times in total, rather than only two as required in her own SLO.   Simply put, the Board correctly found that the referee's report relied solely upon Belluardo's own self-serving testimony that she did not provide her students with the answers to the SDQA while ignoring the greater weight of the evidence.

{¶ 29} As permitted by R.C. 3319.16, the trial court conducted its own review of all of the evidence submitted at the hearing and came to the same conclusion as that of the Board.   Specifically, the trial court made the following findings based upon its own review of the evidence adduced at the hearing:

1) A student informed Ms. Santos that [Belluardo] provided answers to tests and Ms. Santos relayed that information to [Principal] Sledge ***.

2) On multiple occasions, [Belluardo] has admitted providing exact words to her students: a) [Belluardo] admitted doing so to Ms. Heiligenberg on the morning of May 9, 2014; b) [Belluardo] admitted doing so in writing in the May 9, 2014 Document; c) [Belluardo] admitted doing so at her *Loudermill* Hearing; d) [Belluardo] admitted doing so at the Referee's Hearing; e) [Belluardo] admitted doing so in her Post-Hearing Brief before Referee Butz.; and f) [Belluardo] admitted doing so in her Brief before [the trial court].

{¶ 30} In reaching its decision, the trial court concluded that the evidence establishes that Belluardo had acknowledged improper conduct by giving her students before the test exact words to be tested and that she admits this was wrong.   "It is true that a referee's recommendations should be given considerable weight in deciding

whether or not to terminate a teacher's contract. However, responsibility for making the ultimate decision belongs to the school board, and therefore not only is it their right to make an independent determination, but they are required to do so." *Wells v. Madison Loc. School Dist. Bd. of Edn.,* 12th Dist. Butler No. CA84-10-116, 1985 WL 7682 (July 15, 1985), citing *Florian v. Highland Loc. School Dist. Bd. of Edn.*, 24 Ohio App.3d 41, 493 N.E.2d 249 (9th Dist.1983).

**{¶ 31}** In the instant case, the trial court found as did the Board that the referee's report failed to properly address and/or completely ignored a great deal of evidence which clearly established that Belluardo committed academic fraud by providing her students with the list of words that came directly from the SDQA. In doing so, the trial court found that Belluardo gave her students a distinctly unfair advantage on the test, which would in turn, artificially and improperly result in a better evaluation for Belluardo from the SLO Committee. Belluardo attempted to defend her actions by arguing that she was not properly trained on how to prepare her materials for the SLO Committee. However, the record establishes that Belluardo had at least three years of experience in administering the SDQA to her students. Belluardo admitted that providing the students with the words from the test in advance was prohibited. Furthermore, Belluardo admitted that administering the SDQA two additional practice times prior to the final test would more than likely give her students an advantage and result in higher scores. Two teachers and one administrator testified that based on their own personal knowledge, Belluardo's students could not have advanced four or five reading grade levels in only six months. Moreover, the evidence established that Belluardo admitted to Ms. Heiligenberg, Principal Sledge, and Dr. Gates that she had given her students word lists directly from the SDQA

to study over winter and spring breaks.   Therefore, we conclude that the trial court's decision affirming the Board's order terminating Belluardo's position as an intervention specialist for Jefferson Township elementary students with special needs was not an abuse of discretion and was clearly supported by the manifest weight of the evidence.

{¶ 32} Belluardo's sole assignment is overruled.

{¶ 33} Belluardo's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Susan D. Jansen
Nicholas E. Subashi
Tabitha Justice
Hon. Steven K. Dankof