[Cite as *Ellsworth v. Streetsboro City School Dist. Bd. of Edn.*, 2019-Ohio-4731.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| SHANE ELLSWORTH, et al., | : | **O P I N I O N** |
| Plaintiffs-Appellants, | : | |
| - vs - | : | **CASE NOS.** **2018-P-0104** **2018-P-0105** |
| STREETSBORO CITY SCHOOL DISTRICT BOARD OF EDUCATION, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

Appeals from the Portage County Court of Common Pleas, Case Nos. 2018 CV 00093 and 2018 CV 00094.

Judgment: Affirmed.

*Ira J. Mirkin, Richard T. Bush* and *Danielle L. Murphy,* Green, Haines, Sgambati Co., LPA, 100 Federal Plaza East, Suite 800, P.O. Box 849, Youngstown, OH 44501 (For Plaintiffs-Appellants).

*James A. Climer, Frank H. Scialdone* and *John D. Pinzone,* Mazanec, Raskin & Ryder Co., LPA, 100 Franklin's Row, 34305 Solon Road, Cleveland, OH 44139 (For Defendant-Appellee).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellants, Gretchen Weaver and Shane Ellsworth, appeal the November 19, 2018 decision of the Portage County Court of Common Pleas, as modified on December 7, 2018, which dismissed their R.C. 3319.16 administrative appeal. While a trial court hearing an administrative appeal under R.C. 3319.16 may weigh the evidence,

hold additional hearings, and render factual decision, the appellate court review of that decision is limited to whether the trial court abused its discretion. Therefore, the issue before this court is whether the trial court abused its discretion in affirming the Board's resolution to terminate the appellants' teaching contracts where the Board determined, contrary in some regards to the hearing referee's conclusions of fact and ultimate recommendation, that appellants' conduct constituted "fairly serious matters" and "good and just cause" for termination. Because we find, after a careful and thorough review of the record, that the lower court did not abuse its discretion, the decision of the Portage County Court of Common Pleas is affirmed.

{¶2} The present appeal stems from two original actions, consolidated at the trial court, brought pursuant to R.C. 3319.16 by appellants appealing the termination of their teaching and supplemental contracts. In January 2017, the Board notified, and initiated termination proceedings against appellants based on a complaint alleging that appellants permitted, condoned, and encouraged the hazing of students during Streetsboro High School's summer band camp in 2016 and prior years. Both appellants were immediately suspended without pay pending investigation. At that point, Ms. Weaver had been employed by the Streetsboro City School District as a music teacher and Band Director for twelve years, and Ms. Ellsworth had been employed by the Streetsboro City School District as a music teacher and Assistant Band Director for sixteen years.

{¶3} At appellants' request, a hearing was held, pursuant to R.C. 3319.16, with a referee appointed by the Ohio Department of Education. Specifically, the hearing considered nine instances of alleged hazing occurring in 2016 and two instances of alleged hazing occurring in prior years as laid out in the Notice of Pretermination Meeting

2

provided to appellants. The occurrence of the specific allegations is not generally disputed, though various purportedly mitigating factors are noted by appellants.

{¶4} The hearing lasted 14 days, included 31 witnesses and approximately 80 documentary exhibits, and resulted in a 2,711-page transcript. Following the hearing, the referee issued his Report, Findings of Fact and Recommendation ("Report") to the Board, which found that appellants engaged in three instances of "fairly serious" misconduct during the 2016 band camp and that the misconduct violated the Board's policy. The referee, however, recommended discipline short of employment termination for both appellants. The Board accepted certain factual findings, rejected others as being "against the manifest weight of evidence," and found that the referee "incorrectly considered each activity in isolation and determined that the individual activity was not hazing." The Board ultimately rejected the referee's recommendation of discipline less than termination and adopted a resolution to terminate appellants' teaching and supplemental contracts.

{¶5} A detailed look at the specific allegations, the referee's findings, and the Board's ultimate determination is foundational to understanding appellants' assignments of error:

{¶6} You permitted, condoned, and encouraged the hazing of students during the Streetsboro City School District's 2016 band camp as evidenced by the following:

{¶7} 1. Permitting senior band members and chaperones to hurl water balloons at underclass band members who were practicing their formations;

{¶8} 2. Forcing underclass band members to stand at attention, and prohibiting them from moving, while the senior band members sprayed water guns at and/or silly string on them;

{¶9} The referee found specifications one and two did occur, but that they did not create a substantial risk of harm and were not a form of initiation, and, therefore, did

3

not constitute a "fairly serious matter" meriting discipline or termination. The Board did not expressly disagree with the referee's finding of fact as to these specifications but disagreed with the Referee's determination that hazing, as a whole, did not occur.

{¶10} 3. Participating in a skit with an intent to target and humiliate a freshman band member, and by further sharing the freshman band member's personal information with senior band members with the intent to ridicule the freshman band member;

{¶11} The referee found that both appellants performed a skit in front of the band which compared renaissance artists who were skilled in drawing male genitalia to an incoming freshman boy and then held up the freshman boy's agenda notebook, in which he had drawn pictures of male genitalia, to the senior band members. Without concluding whose testimony he found to be more credible, the referee noted that the Board presented evidence that during Ms. Weaver's investigatory interview, she stated that the skit was intended to be a "got-you" moment, to send him a message that he should not have written in the agenda as he did, and to make an example of him, although she denied such at the hearing. Regardless of intent, the referee found that their actions were inappropriate and in bad taste, at best reckless and at worst intentional, and it was a "fairly serious matter" that constitutes good and just cause to take disciplinary action against appellants, but found that because it was not a requirement or form of initiation, it did not constitute hazing. The Board expressly agreed with this finding of fact, only disagreeing with the Referee's determination that hazing did not occur.

{¶12} 4. Participating in a skit that disparaged two former band members and a former administrator in front of band members and chaperones;

{¶13} The referee found that appellants performed a skit in front of the band in which they named two former students and a former administrator as "people who were

4

not being missed." The referee found that their actions were inappropriate and in bad taste and constituted good and just cause to take disciplinary action short of termination against appellants; however, because it was not a requirement or form of initiation, the referee found it did not constitute hazing. The Board expressly agreed with this finding of fact, only disagreeing with the Referee's determination that hazing did not occur.

{¶14} 5. Approving and/or permitting senior skits that included inappropriate language, sexual content, and which were otherwise inappropriate for a school activity;

{¶15} The referee found that several skits performed by senior members of the band contained sexual references and inappropriate language[1], noting that "even Ms. Weaver admitted that the skits violated the rules." The referee found that appellants' failure to adequality preapprove the skits, as they had stated to band members' parents that they would, the skits contain some content inappropriate for a school activity. The referee found, however, it did not rise to the level of "fairly serious matter."[2] The Board disagreed with this conclusion.

{¶16} 6. Permitting senior band members to throw, push, or otherwise force underclass band members into a lake when at least one of the underclass band members was unable to swim;

{¶17} 7. Permitting band members to engage in an unsafe activity by swimming in the lake after 11:00 p.m. in violation of camp rules which prohibited swimming in the lake after 11 p.m. and when no lifeguards were present;

---

1. Specifically, there was testimony of a skit entitled "Netflix and No Chill," and that "Netflix and Chill" is a way of stating that people would watch Netflix and have sex; a skit entitled "Stitch-N-Bitch" which referenced two students having sex; and a skit entitled "Hair Salon Bitching Skit," containing a reference to a male student "not finishing" during sex with a female student. Conflicting testimony was also presented that senior band members used inappropriate language such as "hell."

2. For example, the referee found that the word "bitch" as used in these skits was not inappropriate in this day and age as it was used to mean "complain" and not to specifically call a student a "bitch."

{¶18} The referee found that the allegations in six and seven did occur, noting, however, that there was "inconclusive testimony as to the time of night when this event occurred" and that there were at least seven chaperones at the dock and beach during the event, including a paramedic, an emergency room nurse, a fire department captain, and a scuba instructor. The referee noted that while some students testified that they did not know they did not have to go into the water, he found that the students were informed they did not have to participate, and some students did not participate. Nevertheless, the referee found it to be a generally unsafe activity, despite the precautions taken, and that appellants permitted senior band members to throw, push, or otherwise force underclass band members into a lake when at least one of the underclass band members was unable to swim. Accordingly, the referee concluded this constituted a "fairly serious matter" providing good and just cause for discipline, but because it was not a requirement or form of initiation, it was not hazing. The Board accepted these facts but rejected the conclusion that it did not constitute hazing and was not just cause for termination.

{¶19} 8. Permitting senior band members to wake up the underclass band members at or around 2:30 a.m. with noisemakers and loud music, and further permitting the senior band members to trash the rooms, bathrooms, and camp grounds;

{¶20} The referee found that the seniors were permitted to stay up late to "decorate" the campgrounds with chalk drawings on the sidewalk, spray paint on the practice field, and bubble wrap, sticky notes, and packing peanuts around the dorms. Before going to bed, the seniors would play loud music or noise for a short duration, which woke up some underclass band members. The referee found that this did not cause substantial harm to students and this was not a fairly serious matter. The Board's decision did not specifically comment on this allegation.

6

{¶21} 9. Forcing the underclass band members to clean up the rooms, bathrooms, and camp grounds that the senior band members had trashed;

{¶22} The referee found that all band members were required to participate in cleaning up the campgrounds and that the underclassmen were not assigned the dirtiest areas, and that this did not cause substantial harm to students, was not hazing, and thus, was not a fairly serious matter meriting discipline or termination. The Board's decision did not specifically comment on this allegation.

{¶23} You permitted and condoned similar conduct during the band camp in prior years, as evidenced by:

{¶24} [10.] Permitting senior band members to plastic wrap underclass band members together while the band was at attention, including at least one band member who was unwilling to be plastic wrapped to another band member and attempted to escape during the incident; and

{¶25} The referee found that underclass band members were wrapped together with saran wrap, at least one unwillingly so, that they were not wrapped so tightly that they could not move, they were not left alone, and they were wrapped for a relatively short period of time. The referee concluded that this was not hazing and not a fairly serious matter. The Board disagreed, finding it was a fairly serious matter that constituted good and just cause for termination.

{¶26} [11.] Permitting a student to be ridiculed during the 2014 band camp with a skit about the student making her way through the percussion section.

{¶27} The referee found that the events did occur but that this was not a fairly serious matter because the student stated she was not offended, and that the record does not "demonstrate that this was a sexual reference that was intended to or did ridicule the girl." Accordingly, the referee found that this was not a fairly serious matter. The Board

7

disagreed, finding that the appellants had a duty to ensure the skits were appropriate and would not ridicule students and that their failure to do so constituted a fairly serious matter and good and just cause for termination.

{¶28} In addition to these 11 allegations, appellants were also accused of failing to report any instances of hazing, failing to take action to end hazing, creating a culture where hazing is acceptable and encouraged and students were instructed not to report these incidents, as indicated by the phrase, "what happens at band camp, stays at band camp." Finding that there was no hazing, however, the referee found the appellants had no duty to report hazing. The referee found that the appellants did use the phrase "what happens at band camp, stays at band camp" but that it was not intended to keep students from reporting serious matters; accordingly, the referee found it did not constitute a fairly serious matter or good and just cause for termination. The Board's decision did not specifically comment on this allegation.

{¶29} Ms. Weaver was also accused of retaliating against a student who reported these instances of hazing and violating a directive from the school's principal prohibiting "senior pranks" and "senior prank night." The referee found that "a preponderance of the evidence does not support a finding that Ms. Weaver retaliated against [a student] for reporting incidents regarding band camp to the administration." Furthermore, the referee found the appellants did not violate a 2007 memo from the principal prohibiting "senior pranks," because the events as alleged did not constitute "senior pranks." The Board's decision did not specifically comment on these allegations.

{¶30} The referee also noted, "[w]hile the students may have felt 'pressure' to be at band camp, it does not mean that pressure was real. The activities that occurred at

8

band camp were not so outrageous as to be outside the bounds of decency and acceptability. [Appellants] ran band camp for twelve years and received only two complaints of alleged hazing." Therefore, the referee concluded, attendance at band camp was not an act of initiation into band, it did not create a substantial risk of mental or physical harm, and thus did not constitute hazing.

{¶31} Upon the issuance of the Board's termination resolution, appellants filed original actions in the Portage County Court of Common Pleas pursuant to R.C. 3319.16; the cases were consolidated. In November 2018, the court issued an order, miscaptioned as an order granting summary judgment, which summarily affirmed the termination. The court later issued a nunc pro tunc order correcting the caption to read "Order dismissing Appellants' Administrative Appeal." Appellants moved for findings of fact and conclusions of law, and, at the court's direction, both parties submitted proposed findings of fact and conclusions of law; the court adopted the Board's proposed findings of fact and conclusions of law with little modification. Appellants then initiated the instant appeal.

{¶32} Appellants set forth five assignments of error for our review.

{¶33} A reviewing board must consider and weigh the referee's report and recommendation, giving due deference to the referee's findings. *Aldridge v. Huntington Local School Dist. Bd. of Educ.*, 38 Ohio St.3d 154, 157 (1988). The referee's findings of fact must be sustained, unless the board "finds they were not supported by the greater weight of the evidence." *Id.* at 158. However, a board is not bound by the referee's recommendation. *Id.* at 157. *See also Graziano v. Bd. of Edn. of Amherst Vill. Sch. Dist.*, 32 Ohio St.3d 289, 293 (1987).

9

{¶34} An R.C. 3319.16 appeal of the board's decision to the court of common pleas is not a trial de novo but an original action; the court may weigh the evidence, hold additional hearings, and render factual determinations. *Graziano, supra,* at 286. "The Common Pleas Court may reverse an order of termination of a teacher's contract, made by a Board of Education, where it finds that such order is not supported by or is against the weight of the evidence." *Hale v. Lancaster Bd. of Edn.*, 13 Ohio St.2d 92 (1968) paragraph one of the syllabus.

{¶35} A court of appeals reviews the lower court's determination of a R.C. 3319.16 appeal for abuse of discretion. *James v. Trumbull Cty. Bd. of Edn.*, 105 Ohio App.3d 392, 396 (11th Dist.1995). "The phrase 'abuse of discretion' is one of art, denoting a judgment exercised by a court, which does not comport with reason or the record." *Lifton v. Ashtabula Cty. Bd. of Health*, 11th Dist. Ashtabula No. 2015-A-0025, 2016-Ohio-1299, ¶16. "An abuse of discretion may be found when the trial court 'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" *Denvir v. Blewitt*, 11th Dist. Portage No. 2018-P-0023, 2019-Ohio-187, ¶17, quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.). "Absent an abuse of discretion on the part of the trial court, the court of appeals may not engage in what amounts to a substitution of judgment of the trial court in an R.C. 3319.16 proceeding." *Graziano, supra,* at 294.

{¶36} Appellants' first assignment of error states:

{¶37} [1.] The Trial Court Erred in Affirming Appellee Streetsboro City School District Board of Education's Resolutions Terminating the Teaching Contracts of Appellants Gretchen Weaver and Shane Ellsworth and in Dismissing Their Appeals under R.C. 3319.16 (T.d. 94-36, 40, 47.)

{¶38} Under this assignment of error, appellants argue that the Board and trial court erred in finding the "Daugherty test" inapplicable to this case. The Daugherty test, originally created by Arbitrator Carrol Daugherty and now commonly used by labor arbitrators, examines seven factors to determine whether just cause exists for terminating employment. *See Summit Cty. Children Servs. Bd. v. Communication Workers of Am., Local 4546,* 113 Ohio St.3d 291, 2007-Ohio-1949. In regard to the Daugherty factors, the referee herein stated:

{¶39} The Ohio Supreme Court further stated in the context of an arbitration arising under a collective bargaining agreement that a "just cause" standard to be applied in that context is the seven-factor test adopted by Arbitrator Carroll R. Daugherty, although the Court stated that it is not the only test for "just cause." * * * In summary and in essence, in determining whether "just cause" exists, it must be determined whether: (1) the alleged actions upon which the proposed discipline is based has been adequately established by the evidence; and (2) if so established, whether the proposed discipline to be imposed is reasonable in light of the nature, character and gravity of the alleged actions and any mitigating circumstances."

{¶40} Though the referee does not expressly discuss any of the seven Daugherty test factors throughout his report, in his recommendation he states:

{¶41} While [appellants'] actions with respect to the lake event, [redacted] and two former students were fairly serious matters that constitute good and just cause per *Hale v. Lancaster Board of Education,* 13 Ohio St.2d 92 (1968), under the *Daugherty* [sic] seven standards for just cause, the Board did not provide notice of the possible or probable consequences of [appellants'] actions, and the termination of [their] employment is not reasonable related to the seriousness of the offense of the overall record of [appellants].

{¶42} The Board objected to the referee's use of these factors and the trial court agreed that the Daugherty factors were inapplicable to this case.

{¶43} Appellants rely on *Communication Workers, supra*; however, this reliance is misplaced. In *Communication Workers,* the appellant was seeking enforcement of the

11

provisions of a collective bargaining agreement ("CBA"), not an appeal pursuant to R.C. 3319.16, as in the case at hand. Moreover, even if the facts in *Communication Workers* were closely analogous to the facts at hand, the Ohio Supreme Court specifically noted that, "[a]lthough we hold that the arbitrator's use of the Daugherty test in this case was proper, we do not suggest that it is the only proper definition or that parties to a CBA are required to use the Daugherty test." *Id.* at ¶19.

{¶44} The Board argues that the Daugherty test is inapplicable here, citing the Tenth District's decision in *Meyers v. Columbus Civ. Serv. Comm.,* 10th Dist. Franklin No. 07AP-958, 2008-Ohio-3521, ¶12. ("Since applying the Daugherty test to determine just cause is discretionary, the commission did not err in failing to employ it in appellant's hearing, and the common pleas court did not abuse its discretion in affirming the commission's decision even though the commission did not apply the Daugherty test.") While *Meyers* is also not an appeal based on R.C. 3319.16, we agree with the *Meyers* court insofar as the Daugherty test is discretionary.

{¶45} The Sixth District has recently discussed the use of the Daugherty test in the context of an R.C. 3319.16 appeal in *Tracey L. Hiss Appellee v. Perkins Local School Dist. Bd. of Education Appellant,* 6th Dist. Erie No. E-18-034, 2019-Ohio-3703. Similar to the Tenth District in *Meyers*, the Sixth District noted that "in a labor-arbitration case arising under a CBA (i.e., *not* a termination proceeding under R.C. 3319.16), the Supreme Court acknowledged that an arbitrator may use the Daugherty test to determine if an employee was discharged with just cause," but expressly stated it was not the exclusive means of determining whether just cause exists. (Emphasis sic.) *Hiss* at ¶151. The court continued:

{¶46} Moreover, the Supreme Court went on to note that, in [*Communication Workers*], it was reasonable for the arbitrator to look to the Daugherty test to supply meaning for "good cause" because it was undefined in the parties' CBA. * * * In contrast, "good and just cause" in a teacher-contract-termination case is not an undefined term. Although R.C. 3319.16 does not provide a definition, the case law does. Thus, the common pleas court exceeded its authority by relying on the Daugherty test (rather than R.C. 3319.16 cases) to determine whether there was good and just cause in this case. *Hiss* at ¶152.

{¶47} We find the Sixth District's position persuasive and applicable here. The CBA governing appellants herein states that "[n]o bargaining unit member shall be disciplined by the Board * * * in an arbitrary and capricious manner or without just cause. * * * Termination of a bargaining unit member's contract shall be in accordance with 3319.16 of the Ohio Revised Code." The CBA does not define "just cause." R.C. 3319.16 states: "The contract of any teacher employed by the board of education of any city, exempted village, local, county, or joint vocational school district may not be terminated except for good and just cause." The Ohio Revised Code does not define "good and just cause," however, Ohio courts have defined "good and just cause" as a "fairly serious matter." *Hale, supra,* at 99. *See also Freshwater v. Mt. Vernon City School Dist. Bd. of Edn.,* 137 Ohio St.3d 469, 2013-Ohio-5000. Fairly serious matters have been found to include matters that are hostile to the school community, including conduct that has or could have a negative impact on students or their parents. *Florian v. Highland Local Bd. of End.,* 24 Ohio App.3d 41, 42 (9th Dist.1983); *Winland v. Strasburg-Franklin School Dist. Bd. of Edn.,* 5th Dist. Tuscarawas No. 12 AP 100058, 2013-Ohio-4670; *Oleske v. Hilliard City Schools Dist. Bd. of Edn.,* 146 Ohio App.3d 57, 61-64-65 (10th Dist.2001).

{¶48} Because there is no precedent requiring the arbitrator to utilize the Daugherty test in a R.C. 3319.16 hearing, and because the case law has established a

13

definition of "good and just cause" in such circumstances, we do not find the court erred in determining that the Daugherty was not applicable to these proceedings.

{¶49} Appellants' first assignment of error is without merit.

{¶50} Appellants' second assignment of error states:

{¶51} [2.] The Trial Court erred in Affirming Termination of Appellants' Teaching Contracts Based upon Factual Specifications Not Included in Both the Charged Specifications and the Board's December 28, 2017 Resolutions. (T.d. 94-36, 40, 47.)

{¶52} Under this assignment of error, appellants argue, without citing any law, "a trial court cannot uphold a teacher's termination based upon specifications which are not set forth in both the original notice of intent to consider termination and in the board's ultimate termination resolution." They point out that while the board's termination resolution apparently "drops" five specifications originally contained in the initial notice,[3] the trial court erred by allowing the Board to assert those specifications during proceedings and by adopting the "dropped" specifications into its findings upholding termination. Appellants also argue that the court considered an additional charge not included in the initial specifications, to wit, that during a prior band camp a female underclassman was called loud, obnoxious, and a "bitch."

{¶53} The Board, however, argues that the trial court did not err in considering these "dropped" specifications because the court is permitted to consider and weigh the evidence presented in the record. We agree.

---

3. The Board's termination resolution does not mention specifications (A)(1), permitting chaperones and seniors to "hurl" water balloons at underclassmen; (A)(8) and (9), permitting seniors to "trash" the camp and forcing underclassmen to clean up; (D), fostering a culture of hazing by encouraging students not to report concerns; and (F), violating the 2007 memo from the principal prohibiting senior pranks.

{¶54} The Ohio Supreme Court has stated that in an R.C. 3319.16 appeal to the trial court, "the clear statutory language does * * * empower the [trial] court to weigh the evidence, hold additional hearings and render factual determinations." *Graziano, supra,* at 293. *See also Katz v. Maple Hts. City School Dist. Bd. of Edn.,* 87 Ohio App.3d 256, 260 (8th Dist.1993); *Johnson v. Edgewood City School Dist. Bd. of Edn.,* 12th Dist. Butler No. CA2008-09-215, 2009-Ohio-3827, ¶8; *Routson-Gim-Belluardo v. Jefferson Twp. Local School Dist. Bd. of Edn.,* 2d Dist. Montgomery No. 26789, 2016-Ohio-1265, ¶26. Indeed, R.C. 3319.16 requires the trial court to "examine the transcript and record of the hearing and * * * hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record."

{¶55} After thoroughly reviewing the record, we find that the court's reference to the "additional" and "dropped" specifications in its Findings of Fact and Conclusions of Law is limited to a statement of the complete notice of the specifications asserted against appellants, a statement of the referee's findings, and testimony by a student that a senior, during a senior sketch, called her a "bitch." The court does not state the "additional" or "dropped" specifications are "fairly serious matters" or cite them as reasons for affirming the Board's termination resolution. Rather, the inclusion of these statements tends to show that the court had a complete view of the underlying proceedings.

{¶56} Nor is this conclusion negated, as appellants argue, by the fact that the Board found the referee "incorrectly considered each activity in isolation." Even dropping certain specifications, the Board found that the referee failed to view, as a whole, those specifications that he determined to be "fairly serious matters," and instead erroneously considered them as isolated incidents. The trial court reviewed the evidence and

15

determined the Board did not err in rejecting some of the referee's findings. We do not find the trial court abused its discretion in doing so.

{¶57} Appellants' second assignment of error is without merit.

{¶58} Appellants' third and fourth assignment of error will be addressed together and state:

{¶59} [3.] The Trial Court Erred in Affirming Termination of Appellants' Teaching Contracts When the Board and the Trial Court Failed to Provide Due Deference to the Factual Findings and Recommendations of the 3319.16 Referee. (T.d. 94-36, 40, 47.)

{¶60} [4.] The Trial Court Erred in Affirming Termination of Appellants' Teaching Contracts When the Referee Determined and the Greater Weight of the Evidence Established that Appellants Did Not Engage in Hazing. (T.d. 94-36, 40, 47.)

{¶61} Under these assignments of error, appellants argue the trial court erred in affirming the Board's termination resolution because the Board improperly determined that the referee's rejection of certain findings of fact was against the manifest weight of the evidence. We note, though the matter is not raised on appeal, that the standard set forth by the Ohio Supreme Court for a board's rejection of a referee's findings of fact is by a greater weight, or preponderance, of the evidence. *Aldridge, supra,* at 158. The Board here, however, specifically stated the findings were against the manifest weight of the evidence. Because this standard is more stringent than required, we find the Board necessarily, albeit implicitly, found the findings of fact were also against a preponderance of the evidence.

{¶62} The Board argues that appellants mischaracterize the referee's determination that appellants' conduct did not constitute hazing as a finding of fact and argues that since they were not findings of fact, the Board was free to accept or reject them. The Board also notes that the termination resolution was based on more than

16

hazing but also on violations of the District's Staff Ethics policy, the Student Supervision and Welfare policy, and Board Policy 5517.01, Bullying and Other Forms of Aggressive Behavior. We disagree with the Board insofar as they argue the referee's determination that no hazing occurred was not a finding of fact. As appellants note in their reply brief, even the Board's own termination resolution characterizes this determination as a factual finding.

{¶63} A Board of Education's authority to terminate a teacher's employment contract under R.C. 3319.16 is composed of two parts: (1) consideration of the referee's factual findings relating to the allegations giving rise to the termination proceedings; and (2) the board's judgment as to whether the facts, as found, constitute good cause for termination. *Aldridge, supra,* at 257 and *Oleske, supra,* at 62. The Board must accept the referee's findings of fact unless such findings are against the greater weight of the evidence but is not bound by the recommendation of the hearing referee. *Aldridge, supra,* paragraph one of the syllabus. *See also Graziano, supra,* at 293. "The referee's primary duty is to ascertain facts. The board's primary duty is to interpret the significance of the facts. * * * [I]n weighing the evidence, the board must give deference to the fact that it is the referee who sees and hears the witnesses." *Aldridge, supra,* at 158.

{¶64} Black's Law Dictionary defines "fact" as "[a]n actual or alleged event or circumstance, as distinguished from its legal effect, consequence, or interpretation * * *." FACT, Black's Law Dictionary (11th ed. 2019). Hazing is an actual event or circumstance, not an effect, consequence, or interpretation, as evidenced by the District's definition of hazing: "performing any act or coercing another, including the victim, to perform any act of initiation into any class, team, or organization that causes or creates a substantial risk

of causing mental or physical harm." Therefore, we find that, under the facts herein, whether hazing occurred is a question of fact, which the Board could only reject if it determined the finding was against the greater weight of the evidence.

{¶65} However, contrary to appellants' assertions, the mere fact that the Board found the referee's findings of fact were against the manifest weight of the evidence does not mean the Board erred, and, by implication, the trial court erred in affirming the Board's decision.

{¶66} The Board explained its reasoning for rejecting some of the referee's findings of fact. It found, inter alia, that the referee provided no explanation for failing to consider the expert witness' testimony that hazing did occur; gave too much weight to the chaperones' testimony that no hazing occurred because the chaperones were not experts in hazing and, as participants in these events, had self-serving reasons to find no hazing occurred; failed to consider, as stated by the expert witness, that initiation is not limited to the initial requirements for signing up for band class but that hazing can occur when students are seeking to gain acceptance into a peer group; weighed too heavily that some students did, in fact, sit out of some of the events; incorrectly compared the events of band camp to another school activity that was not considered hazing because the facts were significantly disparate from the event at band camp; and incorrectly considered each activity in isolation and failed to consider the expert's testimony that it was the series of humiliating activities as part of the initiation and tradition of participating in the marching band that constituted hazing.

{¶67} Furthermore, the referee found that band camp was not required in order to be in the marching band. However, the memo sent to band members by appellants prior

to band camp expressly stated "[m]arching band members are required to be in attendance at band camp." Furthermore, Ms. Weaver testified band camp was required:

**{¶68}** [Counsel for Board:] Were marching band members required to participate in band camp?

**{¶69}** [Ms. Weaver:] As much as they are required to participate in all performances and rehearsals, yes.

**{¶70}** Other testimony was presented to show that some students through the years had to miss band camp due to work, family vacation, or had joined band after band camp. However, it is clear from the testimony that these were exceptions to the rule; band camp was not optional but was required unless students had a legitimate excuse. The uncontroverted evidence showed that if a student missed band camp, they were excluded from marching at events, such as football games, until they learned the music and formations. The referee found that "missing some football games until the music and formations were learned did not deprive students from being in the marching band." However, while this may be a legitimate consequence of missing band camp, an absence from band camp would keep a student from completely and fully participating in marching band, even if the student was still technically enrolled in the band class.

**{¶71}** Moreover, the referee also compared the events at band camp to another incident at the high school which was not found to constitute hazing. In that instance, a senior class member agreed to participate in a pie-eating contest in front of the student body. The administration, after careful consideration and obtaining approval from the student's parents, pranked this student by making it look as if he would be competing against other students in the pie-eating contest, but actually had the other "contestants" not participate once the student was blindfolded.

19

{¶72} While the expert witness declined to determine whether the pie-eating event was hazing, the referee ultimately determined it was not and found that the events at band camp were substantially similar. The referee compared the permission the school obtained from the pie-eating student's parents to the permission "obviously," but not expressly, given by the chaperones at band camp. However, as the Board notes, another student's parent cannot consent for a student not their child. Not every parent gave permission for their child or children to participate in the allegedly-problematic band camp events, and the testimony of the complaining student's parents indicates that they would not have given their consent.

{¶73} Further, the referee did not consider the power-dynamic differential between the two events: the "victim" of the pie eating event was a senior student, well-liked by his peers, whereas the specified events at band camp were inflicted *by* seniors upon *underclassmen*, some of whom were new to high school and still finding their social footing. Furthermore, the pie-eating student volunteered to participate in a pie-eating contest; the only thing he did not consent to was being the *sole* participant, whereas some underclassmen did not volunteer for any participation in the band camp events.

{¶74} Finally, the referee noted that the pie-eating student laughed, as did the students at band camp, and cites this as evidence that no hazing occurred. However, to find that laughter is consent and that consent necessarily means no hazing occurred is fallacious and antithetical to the District's definition of hazing, which specifically states "[p]ermission, consent, or assumption of risk by an individual subjected to hazing shall not lessen the prohibitions contained in this policy." The fact that a student laughs does not necessarily mean that no hazing occurred; indeed, a student may laugh for any

20

number of reasons, not the least of which would be out of peer pressure and a desire to fit in with a group, such as band.

{¶75} In light of the foregoing and our narrow scope of review, we cannot say the trial court's decision affirming the Board's termination resolution does not comport with reason or the record. Accordingly, we find the trial court did not abuse its discretion.

{¶76} Appellants' third and fourth assignments of error are without merit.

{¶77} Appellants' fifth assignment of error states:

{¶78} [5.] The Trial Court Erred in Affirming Termination of Appellants' Teaching Contracts When the Evidence Did Not Support a Determination That Any of Appellants' Alleged Conduct Rose to the Level of Good and Just Cause Under R.C. 3319.16. (T.d. 94-36, 40, 47.)

{¶79} As discussed under the first assignment of error above, "good and just cause" is defined as a "fairly serious matter" that is hostile to the school community or has or could have a negative impact on students or their parents. *Hale, supra; Florian, supra.* Here, the occurrence of these events is not generally disputed, only whether they rise to the level of "good and just cause." Furthermore, as previously discussed, the Board is free to accept or reject the referee's determination as to whether good and just cause for termination existed. *Aldridge, supra,* at 257; *Oleske, supra,* at 62.

{¶80} Appellants argue that a showing of good and just cause under R.C. 3319.116 requires "flagrant, extreme, severe, or persistent misconduct," citing multiple cases. However, we find these cases distinguishable as they involve a single instance of misconduct or did not affect the health and safety of students: *Bertolini v. Whitehall City Sch. Dist. Bd. of Edn.,* 139 Ohio App.3d 595 (10th Dist.2000) (misconduct related to adulterous affair between administrators that occurred outside of school and did not affect the safety of students); *Katz, supra* (misconduct involved one instance of a teacher's

21

misuse of sick leave for an extended vacation); *Winland, supra* (misconduct involved teacher using a school laptop over summer break to privately view pornographic images not on school property); *Johnson, supra* (misconduct involved a teacher permitting students to predict where fellow students would be in 20-years; four students complained about the predictions, which included becoming fat, becoming a pole dancer, birthing multiple children from multiple fathers, and getting a nose job, were embarrassing or upsetting); *James, supra* (misconduct involved use of controversial therapy techniques for special needs students which did not violate any board policy); *Imm v. Newbury Local Sch. Dist.,* 11th Dist. Geauga No. 1308, 1986 WL 14335 (Dec. 5, 1986) (misconduct involved one instance of a teacher calling school vandals "fucking assholes" and briefly wearing a fake holster and gun to the last day of school to perform a skit); *Rumora v. Bd. of Edn.. of Ashtabula Area City Sch. Dist. et al.,* 43 Ohio Misc. 48 (C.P. 1973) (misconduct involved multiple counts of insubordination, including failure to comply with Board directives, and inefficiency as superintendent).

{¶81} Appellants further argue that they "did not have any malicious intent, were on no clear guidance or opportunity to conform their behavior, and were dealing with a less than concrete standard of what constitutes hazing." However, appellants ran band camp for over 12 years and, therefore, oversaw, ratified, or promoted the conduct alleged. Moreover, the referee determined, the Board accepted, and the trial court affirmed that the lake event was not a safe activity; that appellants allowed senior band members to throw or push underclassmen into the lake when at least one of the members was unable to swim; and that appellants' conduct in this regard violated the Staff Ethics and Student Supervision and Welfare policies.

22

{¶82} Testimony was presented to show that Ms. Weaver intended the skit in which she showed the senior band members a freshman's agenda containing drawings of male genitalia to be a "got-you" moment. Furthermore, as one student had asked for and was granted "immunity" from participation in these events, and there were other complaints from students or parents in the past, which tends to show that appellants were on notice. Finally, the District's policies clearly spell out that hazing and harassment will not be tolerated and provides a definition of hazing.

{¶83} The trial court's decision to affirm the Board's determination that the referee erred in finding good and just cause for termination, therefore, does comport with reason and the record. Accordingly, we find that the trial court did not abuse its discretion.

{¶84} Appellants' fifth assignment of error is without merit.

{¶85} For the reasons set forth herein, the judgment of the Portage County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J.,

MARY JANE TRAPP, J.,

concur.

23